43 A.3d 69 (2012)
304 Conn. 483
Carmen I. PEREZ-DICKSON
v.
CITY OF BRIDGEPORT, et al.
No. 18401.
Supreme Court of Connecticut.
Argued May 18, 2011.
Decided May 1, 2012.
*76 Steven D. Ecker, with whom was Gavan F. Meehan, Hartford, for the appellants-cross appellees (defendants).
Max F. Brunswick, New Haven, with whom were Valerie Adams Baker and Josephine Smalls Miller for the appellee-cross appellant (plaintiff).
Marc P. Mercier, Manchester, filed a brief for the Connecticut Employment Lawyers Association as amicus curiae.
ROGERS, C.J., and NORCOTT, PALMER, ZARELLA, McLACHLAN, EVELEIGH and HARPER, Js.
ROGERS, C.J.
The plaintiff, Carmen I. Perez-Dickson, brought this action claiming that the defendants, the board of education of the city of Bridgeport (board), Henry R. Kelly, the former assistant superintendent of the Bridgeport public schools (school district), and Daniel Shamas,[1] the former acting superintendent of the school district, disciplined her for exercising her rights guaranteed by the first amendment to the United States constitution[2] and article *77 first, §§ 3, 4 and 14, of the Connecticut constitution[3] in violation of General Statutes §§ 31-51q[4] and 17a-101e,[5] discriminated against her on the basis of her race in violation of 42 U.S.C. §§ 1981[6] and 1983,[7] and intentionally caused her severe emotional distress. The jury returned a verdict in favor of the plaintiff on all counts and awarded compensatory and punitive damages of $2,003,000, which the trial court subsequently reduced to $1,003,000. Thereafter, the trial court awarded attorney's fees and offer of judgment interest to the plaintiff and rendered judgment in accordance with the verdict. The defendants then appealed[8] claiming that the trial court improperly denied their motion for a directed verdict, to set aside the verdict, and for judgment notwithstanding the verdict on the grounds *78 that: (1) the defendants did not violate § 31-51q because any relevant speech by the plaintiff had been pursuant to her official job duties and such speech is not protected by the first amendment; (2) the plaintiff failed to prove her claim of racial discrimination pursuant to 42 U.S.C. §§ 1981 and 1983; and (3) the plaintiff failed to prove that the defendants had intentionally inflicted severe emotional distress on her. In addition, the defendants claim that the trial court lacked subject matter jurisdiction over the plaintiff's claim pursuant to § 17a-101e, improperly admitted certain newspaper articles as evidence at trial, and improperly calculated offer of judgment interest. The plaintiff filed a cross appeal claiming that the trial court improperly had reduced the damage award and improperly calculated offer of judgment interest. In addition, she contends that her claim pursuant to § 31-51q may be affirmed on the alternate ground that the defendants disciplined her for exercising her speech rights under article first, §§ 3, 4 and 14, of the state constitution, which protect an employee's speech pursuant to official job duties. We agree with the defendants' first three claims and with their claim that the trial court lacked jurisdiction over the plaintiff's claim pursuant to § 17a-101e. We also conclude that the plaintiff's alternate ground for affirmance was not preserved for review. Accordingly, we reverse the judgment of the trial court and direct judgment for the defendants.[9]
The jury reasonably could have found the following facts. In 1998, the plaintiff, who is of African-American and Puerto Rican descent, was appointed as the principal of Beardsley School in the school district. In December of that year, she noticed that a white male teacher, V.L., was repeatedly mistreating a sixth grade student. At one point, the student came to the plaintiff and showed her his hand, which was red and swollen. The student told her that V.L. had followed him as he entered the lavatory and had squeezed his hand around the doorknob so hard that he caused the injury. The plaintiff took the student to the school nurse and instructed her to report the injury to the department of children and families (department). The plaintiff also telephoned Kelly and told him what had happened. In addition, she sent a memorandum to Kelly about the incident. V.L. was placed on paid administrative leave several months after the incident.
In January, 1999, Kelly asked all of the school district principals, including the plaintiff, to come individually to his office to discuss what they had achieved during the first half of the school year. During his meeting with the plaintiff, Kelly stated that he was concerned about the climate at Beardsley School and that the plaintiff's career was in jeopardy.[10] The plaintiff "got choked up" and was frightened. Kelly also told the plaintiff at one point that she should not "make waves" at the school and that, if she intended to walk around the school and visit classrooms, she should carry keys in her pocket and jingle them so that the teachers could hear her coming and "behave."
*79 In April, 1999, a parent of a student at Beardsley School told the plaintiff that a teacher, T.B., had thrown the student against the wall and physically and verbally abused him. The plaintiff reported the abuse to the department and to Kelly. Kelly came to the plaintiff's office and interviewed the student about the incident. After reviewing the student's school record, Kelly observed that the student had moved frequently and told the student that he seemed to be a problem. The plaintiff told Kelly that the student was the victim and the fact that he moved around a lot did not justify the abuse. Kelly then gave the plaintiff "a look" and raised his eyebrows. T.B. ultimately was placed on paid administrative leave for six weeks.
At the end of the 1998-1999 school year, Kelly prepared a written evaluation of the plaintiff's performance in which he directed the plaintiff to "adjust her managerial style, as necessary, to better ensure effective communication, collaboration and mutual high expectations of students and staff alike" and to "improve in her efforts to identify, address, and (where possible) resolve staff issues, to improve staff morale." The plaintiff wrote on the appraisal form that test scores and student attendance had improved during the course of the year.
In December, 1999, the plaintiff was quoted in a newspaper article as saying that, as a parent and a child advocate, she did not agree with the discipline that V.L. and T.B. had received, and thought that it should have been more aggressive. Shortly thereafter, she received a letter from attorneys for the board requesting that she come to a meeting to discuss whether she had revealed confidential information to the newspaper. The plaintiff told the attorneys at the meeting that the newspaper had misquoted her and that she did not know what the outcome of the abuse cases had been.
At the end of the 1999-2000 school year, Shamas transferred the plaintiff to Newfield School in the school district. Kelly told the plaintiff that she was being transferred because too many teachers were transferring away from Beardsley School. The plaintiff viewed the transfer as a demotion because Newfield School, which had fewer than 300 students, was much smaller than Beardsley School, which had approximately 750 students, and she would be paid $1000 less per year. In 2003, the plaintiff was transferred to Roosevelt School in the school district, which had approximately 900 students.
In 2000, the plaintiff filed a complaint alleging, inter alia, that, from 1998 through 2000, Kelly, joined by Shamas, had engaged in "a campaign of harassment, discrimination and retaliation directed against [her] in response for her cooperation with [the department] and its investigation of the assaults" by V.L. and T.B. and that because, in reporting the alleged assaults to the department, she had "exercised her rights guaranteed by the first amendment to the United States constitution and/or [§§] 3, 4, and 14 of article first of the constitution of the state of Connecticut," the defendants' alleged conduct had violated §§ 31-51q and 17a-101e. In addition, she claimed that the defendants' conduct had been motivated by race in violation of 42 U.S.C. § 1981 and that it had constituted intentional and negligent infliction of emotional distress.
On November 17, 2005, Teresa Carroll, a school board administrator, telephoned the plaintiff and asked her to come to a meeting the next morning. Because Carroll refused to tell the plaintiff what the meeting was about, the plaintiff called John Ramos, the superintendent of the school *80 district.[11] Ramos told the plaintiff that he knew the purpose of the meeting, but that he would not discuss it with her at that time. Carroll informed the plaintiff at the meeting that she had been accused of abusing a student, that she was being placed on paid administrative leave immediately and that she would not be allowed to return to work. The plaintiff became very upset and asked who she had been accused of abusing and the details of the accusation. Carroll refused to answer her questions.
Ramos made the decision to place the plaintiff on administrative leave. He testified at trial that he had become superintendent in June, 2005, that he was not aware of the plaintiff's history in the school system and that his decision was based solely on the gravity of the allegations against her and the fact that the accusation had been made by an adult staff member.
The plaintiff ultimately discovered from reading the newspaper that she had been accused of sexually abusing a male student. The fact that she had been accused of student abuse was reported in a number of newspaper articles. The plaintiff also eventually learned that Deborah Santacapita, an assistant principal at Roosevelt School, had reported to Carroll that she had observed the plaintiff hugging a fourteen year old boy while cupping his buttocks in her hands, "nuzzling" his neck and telling him that he smelled good. The department, which had been notified about the allegations of abuse against the plaintiff and had conducted an investigation, ultimately determined that the allegations were unsubstantiated, and the plaintiff returned to work in January, 2006.[12]
In 2007, the plaintiff filed a fifth revised complaint in which she repeated the previous allegation that she had been subjected to a campaign of harassment in retaliation for the exercise of her constitutional speech rights from 1998 through 2000 in violation of §§ 31-51q and 17a-101e,[13] and added a claim that the defendants' response to the abuse accusation against her in 2005 had violated those statutes. In addition, as in her original complaint, she alleged that the defendants had discriminated against her on the basis of her race in violation of 42 U.S.C. §§ 1981 *81 and 1983 and had intentionally inflicted severe emotional distress on her.
After the plaintiff rested her case at trial, the defendants made an oral motion for a directed verdict in their favor. They argued that, under Garcetti v. Ceballos, 547 U.S. 410, 427, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for [f]irst [a]mendment purposes." (Internal quotation marks omitted.) Id., at 421, 126 S.Ct. 1951 ("[w]e hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for [f]irst [a]mendment purposes, and the [c]onstitution does not insulate their communications from employer discipline"). They further argued that, because the plaintiff had testified that she reported the abuse as a mandated reporter pursuant to General Statutes § 17a-101a et seq., and because she was subject to the school district's policy regarding the reporting of student abuse, under Garcetti, the trial court should render "judgment as a matter of law that [the plaintiff's] activity could not constitute a matter of public concern."[14] In response, the plaintiff argued that "Connecticut [c]ourts have not yet ruled upon whether or not Garcetti applies to state statutes such as § 31-51q" and that "it would make very little sense for the Connecticut courts to decide that a specific state statute can be overruled or undermined in this way."[15] In turn, the defendants claimed that, because the scope of speech protected by the first amendment was a federal issue, Garcetti controlled. The trial court reserved its decision on the motion for a directed verdict until the completion of trial.
The jury returned a verdict for the plaintiff and awarded $3000 in economic damages; $250,000 in noneconomic damages and $250,000 in punitive damages on the claim pursuant to §§ 31-51q and 17a-101e; *82 $250,000 in noneconomic damages and $250,000 in punitive damages on the claim pursuant to 42 U.S.C. §§ 1981 and 1983; and $500,000 in noneconomic damages and $500,000 in punitive damages on the claim of intentional infliction of emotional distress. Thus, the total damage award was $2,003,000.
After trial, the defendants filed a renewed motion for a directed verdict, to set aside the verdict and for judgment notwithstanding the verdict (motion for a directed verdict) and, in the alternative, for remittitur. In support of this motion, they again argued that, under Garcetti, "the [f]irst [a]mendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." Garcetti v. Ceballos, supra, 547 U.S. at 424, 126 S.Ct. 1951. They further argued that, as a matter of law, such speech "simply does not constitute a matter of public concern" under Garcetti.
In her opposition to the defendants' motion, the plaintiff argued that Garcetti did not apply to claims pursuant to § 17a-101e. She further argued that, "in the absence of any clear direction from Connecticut appellate courts that employees such as [the plaintiff] cannot be protected from retaliation for making reports of child abuse, this court may not state as a matter of law that [the plaintiff's] claim under § 31-51q must fail." Without mentioning Garcetti, the trial court denied the defendants' motion for a directed verdict.[16]
The court granted the motion for remittitur in part, however, and eliminated the awards of $500,000 for noneconomic damages on the intentional infliction of emotional distress claim and reduced the punitive award for that claim from $500,000 to attorney's fees and nontaxable costs, resulting in a damages award of $1,003,000. Thereafter, the court awarded the plaintiff attorney's fees of $250,000 and offer of judgment interest in the amount of $596,878 and rendered judgment in accordance with the verdict. This appeal and cross appeal followed.[17]

I
We first address the defendants' claims related to the verdict in favor of the plaintiff on her claims pursuant to §§ 31-51q and 17a-101e.[18]

A
We begin with the defendants' claim that the trial court improperly concluded *83 that the plaintiff's claim that the defendants had disciplined her for exercising her first amendment rights in violation of § 31-51q is not barred by Garcetti v. Ceballos, supra, 547 U.S. 410, 126 S.Ct. 1951.[19] In that case, the United States Supreme Court concluded that, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for [f]irst [a]mendment purposes, and the [c]onstitution does not insulate their communications from employer discipline." Id., at 421, 126 S.Ct. 1951. The plaintiff does not dispute this principle on appeal, nor does she claim that she was not speaking pursuant to her official duties when she reported that V.L. and T.B. had abused students.[20] Accordingly, it is undisputed that the plaintiff's claim that the defendants had violated § 31-51q by disciplining her for exercising her rights under the first amendment is barred by Garcetti. As a result, the trial court improperly denied the defendants' motion for a directed verdict.
With respect to the plaintiff's claim that the judgment can be affirmed on the *84 alternate ground that the defendants violated § 31-51q because they disciplined her for exercising her speech rights under the state constitution, which are broader than her rights under the first amendment, we conclude that this claim was not preserved for review because she never made that claim to the trial court. Accordingly, the trial court and the defendants were entitled to assume that her speech rights under the state constitution were coextensive with her first amendment rights. See State v. Gore, 288 Conn. 770, 776 n. 7, 955 A.2d 1 (2008) (when party does not provide separate analysis of jury trial right under state constitution, this court treats claim as if rights under state and federal constitutions are coextensive).[21]
This court previously has held that "[o]nly in [the] most exceptional circumstances can and will this court consider a claim, constitutional or otherwise, that has not been raised and decided in the trial court.... This rule applies equally to alternate grounds for affirmance." (Citation omitted; internal quotation marks omitted.) New Haven v. Bonner, 272 Conn. 489, 498, 863 A.2d 680 (2005); see also Thomas v. West Haven, 249 Conn. 385, 390 n. 11, 734 A.2d 535 (1999) ("[t]he appellee's right to file a [Practice Book] § 63-4[a][1] statement has not eliminated the duty to have raised the issue in the trial court" [internal quotation marks omitted]), cert. denied, 528 U.S. 1187, 120 S.Ct. 1239, 146 L.Ed.2d 99 (2000); Peck v. Jacquemin, 196 Conn. 53, 62 n. 13, 491 A.2d 1043 (1985) ("compliance with [Practice Book § 63-4(a)(1)] is not to be considered in a vacuum; particularly to be considered is its linkage with [Practice Book § 60-5] which provides in part that this court `shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial'").[22] *85 "Such exceptional circumstances may occur where a new and unforeseen constitutional right has arisen between the time of trial and appeal or where the record supports a claim that a litigant has been deprived of a fundamental constitutional right and a fair trial.... An exception may also be made where consideration of the question is in the interest of public welfare or of justice between the parties."[23] (Internal quotation marks omitted.) Lopiano v. Lopiano, 247 Conn. 356, 373, 752 A.2d 1000 (1998).
We perceive no such exceptional circumstances in the present case. The plaintiff had ample opportunity at trial to raise the claim that Garcetti does not bar her claim pursuant to § 31-51q because the state constitution provides broader protection than the federal constitution, the trial court had the authority to rule on the issue, there has been no intervening change in the law, the plaintiff's claim is not of constitutional magnitude,[24] and the plaintiff received a fair trial.
Moreover, even if we were to assume that a lack of prejudice to an appellant would justify review of an alternate ground for affirmance that was not raised in the trial court, even in the absence of other exceptional circumstances, the plaintiff in the present case has not established that the defendants would not be prejudiced if we were to review this claim.[25] *86 First, even if we assume that the trial court's denial of the defendants' motion for a directed verdict and instructions to the jury were proper under the state constitution, because the defendants believed rightlythat the plaintiff's claims under the first amendment are barred by Garcetti, and they properly presumed that the state constitution provides no broader protection, the defendants may have made the tactical decision to avoid the expense and inconvenience of calling a large number of witnesses to testify in support of other potential defenses to the plaintiff's claims. The defendants should not be punished for their failure to present all possible evidence at the first trial when they had every reason to believe that, even if they presented no evidence, the plaintiff's claim was barred by Garcetti. Accordingly, if we were to conclude that Garcetti does not bar the plaintiff's claim under the state constitution, we would be required to afford the defendants an opportunity to present additional evidence under the new standard. See Oram v. Capone, 206 App. Div.2d 839, 840, 615 N.Y.S.2d 799 (1994) ("[a]n issue may not be raised for the first time on appeal ... where it could have been obviated or cured by factual showings or legal countersteps in the trial court" [internal quotation marks omitted]); Outdoor Media Dimensions, Inc. v. State, 331 Or. 634, 660, 20 P.3d 180 (2001) ("even if the record contains evidence sufficient to support an alternative basis for affirmance, if the losing party might have created a different record below had the prevailing party raised that issue, and that record could affect the disposition of the issue, then we will not consider the alternative basis for affirmance" [emphasis in original]); cf. State v. DeJesus, 288 Conn. 418, 437-38 n. 14, 953 A.2d 45 (2008) (when judgment of conviction is reversed because of change in settled law, case should be remanded for new trial even when it is unlikely that state could present new evidence that would satisfy new standard because "it is not the function of this court, as an appellate tribunal, to deprive the state of that opportunity"); State v. Lawrence, 282 Conn. 141, 156, 920 A.2d 236 (2007) (function of appellate tribunal is "to review, and not to retry, the proceedings of the trial court" [emphasis added; internal quotation marks omitted]). Thus, the defendants would be subject, through no fault of their own, to the great expense and inconvenience of a second trial. Such a result would be inconsistent with the purpose of waiver and forfeiture rules, namely, to "ensure that parties can determine when an issue is out of the case, and that litigation remains, to the extent possible, an orderly progression. The reason for the rules is not that litigation is a game, like golf, with arbitrary rules to test the skill of the players. Rather, litigation is a winnowing process, and the procedures for preserving or waiving issues are part of the machinery by which courts *87 narrow what remains to be decided." (Internal quotation marks omitted.) Exxon Shipping Co. v. Baker, 554 U.S. 471, 488 n. 6, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008); see also id., at 487, 128 S.Ct. 2605 (recognizing that party can raise new argument on appeal in support of properly preserved claim, but rejecting suggestion that "a litigant could add new constitutional claims as he went along, simply because he had `consistently argued' that a challenged [action] was unconstitutional").
Second, the plaintiff's alternate ground for affirmance raises a question of first impression for this court, and it is not at all clear that a conclusion that Garcetti does not apply to claims pursuant to the state constitution would require this court to conclude that the trial court instructed the jury as to the proper legal standard. We note, for example, that before its decision in Garcetti, the United States Supreme Court had held that speech by a public employee was protected by the first amendment only if the speech was on a matter of public concern and the employee's free speech interest was not outweighed by the employer's interest "in promoting the efficiency of the public services it performs through its employees." (Internal quotation marks omitted.) Connick v. Myers, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). If we were to conclude that the Connick standard applies to a public employee's speech pursuant to his or her official duties under the state constitution, we would be required to reverse the judgment and to remand the case for a new trial because the trial court's instruction to the jury was more liberal than that standard.[26]
*88 Third, affirming the damage award for the plaintiff's claim pursuant to § 31-51q would prejudice the defendants because the plaintiff's failure to raise the state constitutional issue in a timely manner deprived them of the opportunity to evaluate and possibly to settle the claim before the jury returned its verdict.[27] Accordingly, we conclude that the claim is unreviewable. We conclude, therefore, that the trial court improperly denied the defendants' motion for a directed verdict in their favor on the plaintiff's claim pursuant to § 31-51q, and that the judgment for the plaintiff may not be affirmed on the alternate ground that the plaintiff's speech was protected by the state constitution.

B
We next address the defendants' claim that the trial court lacked subject matter jurisdiction over the plaintiff's claim pursuant to § 17a-101e because that statute does not create a private cause of action. The plaintiff contends that the defendants' failure to raise this claim at trial renders it unreviewable on appeal. We conclude that the defendants' claim is reviewable and that the trial court lacked subject matter jurisdiction over the plaintiff's claim.
We first address the plaintiff's claim that the defendants' claim is unreviewable. The claim that § 17a-101e does not provide a private cause of action implicates the plaintiff's standing to raise a claim pursuant to that statute. See Burton v. Dominion Nuclear Connecticut, Inc., 300 Conn. 542, 555, 23 A.3d 1176 (2011) ("[S]tatutory aggrievement exists by legislative fiat, not by judicial analysis of the particular facts of the case. In other words, in cases of statutory aggrievement, particular legislation grants standing to those who claim injury to an interest protected by that legislation." [Internal quotation marks omitted.]). "If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause." (Internal quotation marks omitted.) Id., at 550, 23 A.3d 1176. "[A] claim that a court lacks subject matter jurisdiction may be raised at any time during the proceedings ... including on appeal...." (Citation omitted; internal quotation marks omitted.) Bacon Construction *89 Co. v. Dept. of Public Works, 294 Conn. 695, 704 n. 9, 987 A.2d 348 (2010). Because the defendants' claim implicates the trial court's subject matter jurisdiction, we conclude that it is reviewable even though the defendants have raised it for the first time on appeal.
Turning to the merits of the claim that § 17a-101e does not provide a private cause of action, "[w]e begin our analysis with the well settled fundamental premise that there exists a presumption in Connecticut that private enforcement does not exist unless expressly provided in a statute. In order to overcome that presumption, the [plaintiff bears] the burden of demonstrating that such an action is created implicitly in the statute.... In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff one of the class for whose ... benefit the statute was enacted... ? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? ...
"Consistent with the dictates of [General Statutes] § 1-2z, however, we do not go beyond the text of the statute and its relationship to other statutes unless there is some textual evidence that the legislature intended, but failed to provide expressly, a private right of action. Textual evidence that would give rise to such a question could include, for example, language granting rights to a discrete class without providing an express remedy or language providing a specific remedy to a class without expressly delineating the contours of the right." (Citations omitted; internal quotation marks omitted.) Gerardi v. Bridgeport, 294 Conn. 461, 468-69, 985 A.2d 328 (2010).
Whether § 17a-101e provides a private cause of action is a question of statutory interpretation over which our review is plenary. See id., at 467, 985 A.2d 328. "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature.... In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply.... In seeking to determine that meaning ... § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) Id., at 467-68, 985 A.2d 328
Section 17a-101e provides in relevant part: "(a) No employer shall discharge, or in any manner discriminate or retaliate against, any employee who in good faith makes a report pursuant to sections 17a-101a to 17a-101d, inclusive, and 17a-103, testifies or is about to testify in any proceeding involving child abuse or neglect. The Attorney General may bring an action in Superior Court against an employer who violates this subsection...."
Both the contours of the right created by § 17a-101e and the specific remedy for a violation of the right are plain and unambiguous. Nothing in the text of the statute even remotely suggests that, contrary to this plain and unambiguous language, the legislature intended to authorize private citizens to bring actions on their own behalf pursuant to the statute. Indeed, the plaintiff does not contend otherwise. *90 Rather, she claims only that the defendants' claim that § 17a-101e does not create a private cause of action is unreviewable, a claim that we have rejected. Accordingly, we conclude that § 17a-101e does not provide a private cause of action and that the trial court therefore lacked subject matter jurisdiction over the plaintiff's claim pursuant to that statute.

II
We next address the defendants' claim that the plaintiff failed to establish a prima facie case that they had discriminated against her on the basis of her race in violation of 42 U.S.C. §§ 1981 and 1983 or, in the alternative, that she failed to prove racial discrimination by a preponderance of the evidence.[28] We conclude that the plaintiff failed to prove her case.
The following additional facts that the jury reasonably could have found are relevant to our resolution of this claim.[29] The board had a written policy concerning child abuse that required all allegations of abuse to be reported to the board's director of social work who, together with the principal of the school where the abuse had occurred, or the principal's designee, would then "decide how to conduct [an]... internal investigation...." At trial, the plaintiff presented documentary evidence that, when a teacher or administrator was accused of abusing a student, the board had a regular practice of interviewing the person who had been accused before taking any action against the employee.[30] In addition, the plaintiff testified that, while she was the principal at Beardsley School, a white female teacher had been accused of physically abusing a student. Susan Smith, the board's director of social work, had asked the plaintiff whether the accusation was "in the realm of possibility...." When the plaintiff *91 said that it was not, there was no further action against the teacher. In another case, a white female teacher had been accused of "hurting" a student while the plaintiff was the principal of Roosevelt School, and the plaintiff had interviewed the teacher as part of her investigation.[31] The teacher was not placed on administrative leave.
Kelly testified on cross-examination that, when a white male principal, L.R., had been accused by a parent of physically abusing a student, the board had conducted a thorough investigation, including interviewing a teacher, attempting to interview L.R., and requesting that the school social worker prepare a written summary of interviews by the department. The incident occurred in 1998. Kelly also testified that, in a case in which an elementary school had been accused of physically neglecting a student, the white female principal of the school, A.E., had been provided with an opportunity to respond to the accusation. The incident occurred in 2000.
Smith testified that in 2003 or 2004, the board stopped its practice of conducting extensive investigations of abuse allegations against school district employees in cases where the department was also conducting an investigation. She stopped the practice because it was her understanding that the department was concerned that investigations by the board could taint witnesses and interfere with the department's investigations. Carroll testified, however, that, after the plaintiff was placed immediately on administrative leave in the fall of 2005, as the result of the allegation that she had abused a student, Carroll investigated a number of claims that school administrators had abused students and interviewed the alleged perpetrator as part of the investigation. In one case, Carroll interviewed a male African-American principal about an alleged incident of physical abuse that had occurred on October 13, 2006.[32] In another case involving the plaintiff herself, Carroll interviewed the plaintiff about a parent's allegation that she had abused a student on February 15, 2008. No one from the board ever interviewed the plaintiff or the student she had been accused of abusing concerning the allegations of abuse that led to her administrative leave in 2005.
Ramos testified that, during the fall of 2005, he became aware of pending allegations that a white male principal in the school district, A.C., had engaged in sexual harassment. He further testified that, when the board became aware of allegations that A.C. had abused students, it placed him on administrative leave without first investigating the allegations or interviewing him.[33] Kelly testified that an *92 African-American female principal, S.A., who had been accused of physically abusing a student in 2001, was given an opportunity to respond to the accusation and was not placed on administrative leave until the board received reports of additional abuse. Kelly also testified that a male African-American principal, J.A., who had been accused of physically abusing a student on April 27, 2006, was provided with specific information about the allegations against him and was given an opportunity to respond.
At the conclusion of the plaintiff's case, the defendants made an oral motion for a directed verdict on the plaintiff's claim pursuant to 42 U.S.C. §§ 1981 and 1983 on the ground, inter alia, that the evidence would not support a finding of racial discrimination. The trial court reserved its decision on the motion until the conclusion of trial. The defendants renewed their claim in their posttrial motion for a directed verdict. The trial court denied that motion.
With this background in mind, we first set forth our standard of review. "The standards for appellate review of a directed verdict are well settled. Directed verdicts are not favored.... A trial court should direct a verdict only when a jury could not reasonably and legally have reached any other conclusion.... In reviewing the trial court's decision to direct a verdict in favor of a defendant we must consider the evidence in the light most favorable to the plaintiff.... Although it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven ... it may not resort to mere conjecture and speculation.... A directed verdict is justified if ... the evidence is so weak that it would be proper for the court to set aside a verdict rendered for the other party." (Internal quotation marks omitted.) Coughlin v. Anderson, 270 Conn. 487, 497-98, 853 A.2d 460 (2004).
We next turn to the law governing claims of racial discrimination in violation of 42 U.S.C. §§ 1981 and 1983. To prevail on her claim pursuant to 42 U.S.C. § 1983, the plaintiff must establish that the defendants intentionally discriminated against her. Bennett v. Roberts, 295 F.3d 687, 699 (7th Cir.2002). "When a plaintiff claims disparate treatment under a facially neutral employment policy, this court employs the burden-shifting analysis set out by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this analysis, the employee must first make a prima facie case of discrimination. The employer may then rebut the prima facie case by stating a legitimate, nondiscriminatory justification for the employment decision in question. The employee then must demonstrate that the reason proffered by the employer is merely a pretext and that the decision actually was motivated by illegal discriminatory bias. Id., at 802-804, 93 S.Ct. 1817." Craine v. Trinity College, 259 Conn. 625, 636-37, 791 A.2d 518 (2002). The McDonnell Douglas Corp. burden-shifting analysis is applicable to claims brought pursuant to 42 U.S.C. §§ 1981 and 1983. See Lockridge v. Board of Trustees of the University of Arkansas, 315 F.3d 1005, 1009-10 (8th Cir.2003).
"The burden of establishing a prima facie case [of discrimination] is a burden of production, not a burden of proof, and therefore involves no credibility assessment by the fact finder.... The level of proof required to establish a prima facie case is minimal and need not reach *93 the level required to support a jury verdict in the plaintiff's favor." (Citation omitted.) Craine v. Trinity College, supra, 259 Conn. at 638, 791 A.2d 518. To establish a prima facie case of discrimination in the employment context, the plaintiff must present evidence that: (1) she belongs to a protected class; (2) she was subject to an adverse employment action; and (3) the adverse action took place under circumstances permitting an inference of discrimination.[34] See id. To establish the third prong, a litigant may present circumstantial evidence from which an inference may be drawn that similarly situated individuals were treated more favorably than she was. Id., at 639, 791 A.2d 518; see also Paylan v. St. Mary's Hospital Corp., 118 Conn.App. 258, 266, 983 A.2d 56 (2009). To be probative, this evidence must establish that the plaintiff and the individuals to whom she seeks to compare herself were "similarly situated in all material respects...." (Emphasis added; internal quotation marks omitted.) Paylan v. St. Mary's Hospital Corp., supra, at 269, 983 A.2d 56; see also Shumway v. United Parcel Service, Inc., 118 F.3d 60, 64 (2d Cir.1997). "[A]n employee offered for comparison will be deemed to be similarly situated in all material respects if (1) ... the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) ... the conduct for which the employer imposed discipline was of comparable seriousness. Graham v. Long Island Rail Road, [230 F.3d 34, 40 (2d Cir.2000) ]." (Internal quotation marks omitted.) Paylan v. St. Mary's Hospital Corp., supra, at 269, 983 A.2d 56.
"Upon the defendant's articulation of ... a non-discriminatory reason for the employment action, the presumption of discrimination arising with the establishment of the prima facie case drops from the picture. See [St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ]; Fisher [v. Vassar College, 114 F.3d 1332, 1336 (2d Cir.1997)]." Weinstock v. Columbia University, 224 F.3d 33, 42 (2d Cir.2000), cert. denied, 540 U.S. 811, 124 S.Ct. 53, 157 L.Ed.2d 24 (2003). If the jury disbelieves the nondiscriminatory reason proffered by the employer, the burden is then on the plaintiff to prove by a preponderance of the evidence that the real reason for the disparate treatment was discrimination on the basis of membership in the protected class. St. Mary's Honor Center v. Hicks, supra, at 519, 113 S.Ct. 2742 ("[i]t is not enough ... to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination" [emphasis in original]); id., at 515, 113 S.Ct. 2742 ("a reason cannot be proved to be `a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason" [emphasis in original]); see also Weinstock v. Columbia University, supra, at 42 (if jury disbelieves employer's explanation for disparate treatment, "the question becomes whether the evidence, taken as a whole, supports a sufficient rational *94 inference of discrimination"); Board of Education v. Commission on Human Rights & Opportunities, 266 Conn. 492, 512, 832 A.2d 660 (2003) (when employee established prima facie case of discrimination and fact finder reasonably disbelieved reasons for disparate treatment proffered by employer, sole remaining issue was "whether the [fact finder] reasonably could have inferred from the evidence before it that the [employer] intentionally discriminated against [the employee] on the basis of race or color").
When the employer has rebutted the presumption of discrimination arising from the plaintiff's prima facie case by providing reasons for the disparate treatment, "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to [satisfy the plaintiff's ultimate burden of proving] intentional discrimination." (Emphasis added.) St. Mary's Honor Center v. Hicks, supra, 509 U.S. at 511, 113 S.Ct. 2742. "Certainly [however] there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. See Aka v. Washington Hospital Center, 156 F.3d [1284, 1291-92 (D.C.Cir.1998) (en banc) ]; see also Fisher v. Vassar College, [supra, 114 F.3d at 1338] ([i]f the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent)." (Internal quotation marks omitted.) Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).
In summary, when a plaintiff attempts to establish racial discrimination through the use of circumstantial evidence, the plaintiff must first present some evidence from which an inference may be drawn that other similarly situated individuals not in the protected class were treated more favorably than the plaintiff. See Craine v. Trinity College, supra, 259 Conn. at 639, 791 A.2d 518. If the defendant then articulates a nondiscriminatory reason for the disparate treatment, the presumption of discrimination arising from the prima facie case "drops from the picture." Weinstock v. Columbia University, supra, 224 F.3d at 42. The burden will then be on the plaintiff to prove by a preponderance of the evidence that the employment action was discriminatory. Id. Finally, although the evidence that a plaintiff presented in support of her prima facie case may be sufficient to satisfy her ultimate burden of proof, that will not necessarily be the case. Reeves v. Sanderson Plumbing Products, Inc., supra, 530 U.S. at 148, 120 S.Ct. 2097; see also Craine v. Trinity College, supra, at 638, 791 A.2d 518 ("[t]he level of proof required to establish a prima facie case is minimal and need not reach the level required to support a jury verdict in the plaintiff's favor").
This court previously has recognized that "[s]tatistical evidence in a disparate treatment case, in and of itself, rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its [adverse employment] decision.... This is because a[n] [employer's] overall *95 employment statistics will, in at least many cases, have little direct bearing on the specific intentions of the employer.... Without an indication of a connection between the statistics, the practices of the employer, and the employee's case, statistics alone are likely to be inadequate to show that the employer's decision ... was impermissibly based on [a protected trait]."[35] (Internal quotation marks omitted.) Board of Education v. Commission on Human Rights & Opportunities, *96 supra, 266 Conn. at 516, 832 A.2d 660. Standing alone, statistical evidence is sufficient to establish discriminatory intent in individual disparate treatment actions only when it shows a "stark pattern of discrimination...." (Internal quotation marks omitted.) Aragon v. Republic Silver State Disposal, Inc., 292 F.3d 654, 663 (9th Cir.2002); id. ("statistics must show a stark pattern of discrimination unexplainable on grounds other than [discrimination on the basis of membership in the protected class]" [internal quotation marks omitted]); see also Ottaviani v. State University of New York, 875 F.2d 365, 371 (2d Cir.1989) (in individual disparate treatment actions, "[w]here gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination" [emphasis added; internal quotation marks omitted]), cert. denied, 493 U.S. 1021, 110 S.Ct. 721, 107 L.Ed.2d 740 (1990); Chesna v. United States Dept. of Defense, 850 F.Supp. 110, 117-18 (D.Conn. 1994) (to prove intentional discrimination in violation of equal protection clause through circumstantial evidence of disparate treatment, plaintiff must show stark pattern of discrimination); Life Technologies v. Superior Court, 197 Cal.App.4th 640, 650, 130 Cal.Rptr.3d 80 (2011) ("Statistical evidence may ... be utilized in a disparate treatment case. However, because discriminatory intent must be shown in such a case, statistical evidence must meet a more exacting standard."); Smith College v. Massachusetts Commission Against Discrimination, 376 Mass. 221, 228 n. 9, 380 N.E.2d 121 (1978) (in individual disparate treatment action, "gross statistical disparities alone may constitute prima facie proof of a practice of discrimination" [emphasis added]).[36]
With these principles in mind, we turn to the defendants' claim in the present case that the plaintiff failed to establish that they had discriminated against her on the basis of her race. The plaintiff contends that the evidence established that the defendants had treated her differently than other similarly situated school district employees. Specifically, she claims that, unlike six white employees who were accused of abusing students,[37] she was not given specific information about the allegations against her or provided with an opportunity to respond to the allegations before *97 she was placed on administrative leave.
The defendants contend that, to the contrary, because the other employees who had been accused of abusing students were not similar to the plaintiff in all material respects, the plaintiff has not established a prima facie case that the defendants discriminated against her on the basis of her race. Specifically, they point out that the plaintiff was a principal; she was accused of sexually abusing a young student; she was accused by her assistant, who was a trained mandated reporter; and she was disciplined by Ramos. In contrast, V.L. and T.B. were teachers, and they, along with L.R., had been accused of physical and verbal abuse, not sexual abuse; they had been accused six years earlier than the plaintiff; they had not been disciplined by Ramos;[38] and the initial accusations against them had not been made by a trained mandated reporter, but by students and, in the case of T.B., a student and a parent. With respect to the two white teachers who the plaintiff had been involved in investigating, and the principal, A.E., the defendants contend that the plaintiff failed to present sufficient information about them to provide a meaningful comparison. The defendants further claim that A.C. was the only individual who was similarly situated to the plaintiff because he was a principal, he had been accused of sexual abuse, he had been disciplined by Ramos, and he was treated the same as the plaintiff.[39] In addition, the defendants claim that, even if the plaintiff established a prima facie case that she had been treated differently than other similarly situated employees, the facts that a mandated reporter had accused the plaintiff and that the allegations of sexual abuse against her were more serious than those against the other employees justified their treatment of her. Finally, the defendants claim that the plaintiff's concession that "similarly situated non-black employees [were] treated in the same manner as [the] plaintiff and other black employees were treated more favorably" is fatal to her claim of intentional discrimination.
We conclude that we need not decide whether the plaintiff was similarly situated to the employees to whom she compares herself because, even if we assume that she was, she has not satisfied her ultimate burden of proof.[40] Specifically, we must conclude that the plaintiff's *98 circumstantial evidence that the defendants treated seven white employees[41] and four African-American employees[42] more favorably than they treated her when she was accused of abusing a student in 2005 is insufficient as a matter of law to raise an inference of intentional racial discrimination. Although "evidence establishing the falsity of the legitimate, nondiscriminatory reasons advanced by the employer may be, in and of itself, enough to support the trier of fact's ultimate finding of intentional discrimination" when the evidence of falsity is strong; (emphasis added) Board of Education v. Commission on Human Rights & Opportunities, supra, 266 Conn. at 511, 832 A.2d 660; see also id., at 511-12, 832 A.2d 660 (commission reasonably could have concluded that employer's failure to comply fully with affirmative action plan, weaknesses, contradictions, inconsistencies and implausibilities in employer's explanations and absence of any African-American employees in relevant employment position, combined with employee's prima facie case, were sufficient to prove falsity of employer's explanation and to satisfy employee's ultimate burden of proof); ambiguous statistical evidence, standing alone, is insufficient as a matter of law to support such a finding. See id., at 515-16, 832 A.2d 660 (employee's statistical evidence was "weak and perhaps meaningless when considered in isolation"); id., at 516, 832 A.2d 660 ("statistics alone are likely to be inadequate to show that the employer's decision ... was impermissibly based on [a protected trait]" [internal quotation marks omitted]). The evidence in the present case simply does not reveal any pattern of disparate treatment on the basis of race, much less the "`stark pattern'" or "`gross statistical disparities'" that are required to prove such claims.[43]Aragon v. Republic Silver State Disposal, Inc., supra, 292 F.3d at 663 *99 ("the statistics must show a stark pattern of discrimination unexplainable on grounds other than [discrimination on the basis of membership in the protected class]" [internal quotation marks omitted]); Ottaviani v. State University of New York, supra, 875 F.2d at 371 (only "`gross statistical disparities'" can support inference of intentional discrimination); see also Bush v. Commonwealth Edison Co., 990 F.2d 928, 931 (7th Cir.1993) ("A plaintiff cannot establish a prima facie case of racial discrimination by showing that ... a coworker of another race was treated more favorably than he, though other coworkers of his race were treated more favorably than other coworkers of other races. Such a pattern, in which blacks sometimes do better than whites and sometimes do worse, being random with respect to race, is not evidence of racial discrimination.").[44] Because the jury could not reasonably have concluded on the basis of the circumstantial evidence presented by the plaintiff that the defendants intentionally discriminated against her on the basis of her race, we conclude that the trial court improperly denied the defendants' motion for a directed verdict on the plaintiff's claim pursuant to 42 U.S.C. §§ 1981 and 1983.[45]

*100 III
Finally, we address the defendants' claim that the trial court improperly denied their motion for a directed verdict with respect to the plaintiff's claim of intentional infliction of severe emotional distress. We agree.
The following procedural history is relevant to our resolution of this claim. At the conclusion of the plaintiff's case, the defendants made an oral motion for a directed verdict on the plaintiff's claim of intentional infliction of emotional distress on the ground that no reasonable person could conclude that the defendants' conduct was sufficiently extreme and outrageous to meet the relevant legal standard. The trial court reserved its decision on the motion until the conclusion of trial. The defendants renewed their claim in their posttrial motion for a directed verdict. The trial court denied that motion.
We begin our analysis with the standard of review. "In order for the plaintiff to prevail in a case for liability ... [alleging intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.... Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine.... *101 Only where reasonable minds disagree does it become an issue for the jury....
"Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society.... Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous! ... Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." (Citations omitted; internal quotation marks omitted.) Appleton v. Board of Education, 254 Conn. 205, 210-11, 757 A.2d 1059 (2000).
We conclude that no reasonable juror could find that the defendants' conduct in the present case met this high threshold. With respect to the defendants' conduct in 1998 and 1999, when Kelly told the plaintiff that her career was in jeopardy during a performance evaluation and Shamas transferred the plaintiff to Newfield School, no juror could conclude that the conduct was "beyond all possible bounds of decency ... atrocious, and utterly intolerable in a civilized community." (Internal quotation marks omitted.) Id., at 211, 757 A.2d 1059; see id., at 210-11, 757 A.2d 1059 (trial court properly granted defendant's motion for summary judgment on plaintiff's claim for intentional infliction of emotional distress when defendants made condescending comments about plaintiff in front of colleagues, questioned plaintiff's vision and ability to read, informed plaintiff's daughter that she was acting differently and should take time off, asked police to escort plaintiff from school, required plaintiff to subject herself to psychiatric testing, forced plaintiff to take leave of absence, suspended plaintiff, and forced plaintiff to resign); Tracy v. New Milford Public Schools, 101 Conn.App. 560, 567-70, 922 A.2d 280 (trial court properly granted motion to strike plaintiff's claim for intentional infliction of emotional distress when plaintiff claimed that defendants conspired to engage in pattern of harassment including denial of position, initiated disciplinary actions without proper investigation, and defamed and intimidated plaintiff), cert. denied, 284 Conn. 910, 931 A.2d 935 (2007). Indeed, there is no evidence that Kelly or Shamas subjected the plaintiff to any unduly humiliating, embarrassing or denigrating language or conduct, intentionally or otherwise. Rather, they subjected her to actions that individuals in the workplace reasonably should expect. See Perodeau v. Hartford, 259 Conn. 729, 757, 792 A.2d 752 (2002) ("individuals [in the workplace] reasonably should expect to be subject to... performance evaluations, both formal and informal; [and] decisions related to such evaluations, such as those involving transfer, demotion, promotion and compensation" and "reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result"). Moreover, even if we were to assume that the defendants were wrongfully motivated in subjecting the plaintiff to this conduct, wrongful motivation by itself does not meet the standard for intentional infliction of severe emotional distress; rather, "it is the act itself which must be outrageous." (Internal quotation marks omitted.) Aquavia v. Goggin, 208 F.Supp.2d 225, 237 (D.Conn. 2002); see Parsons v. United Technologies Corp., 243 Conn. 66, 89, 700 A.2d 655 *102 (1997) ("[t]he mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior" [internal quotation marks omitted]). Finally, the only evidence of severe emotional distress that the plaintiff presented with respect to this conduct is that she became frightened and choked up upon being told that her career might be in jeopardy. There was no evidence that the plaintiff was in distress for an extended period or that she sought medical treatment. No reasonable juror could conclude that this constituted severe emotional distress.
With respect to the defendants' conduct in 2005, when they placed her on paid administrative leave without first providing her with an opportunity to respond to the abuse allegations, the plaintiff contends that the jury reasonably could have found that, "[b]ecause neither the plaintiff nor the alleged victim was questioned by the defendants and [the department] found no truth to the allegations, the jury could have and reasonably did conclude that the entire matter was intentionally fabricated and that the defendants were the perpetrators." (Emphasis in original.) The plaintiff made no claim and presented no evidence at trial, however, that Santacapita had fabricated the allegations against her or that the defendants had to have known immediately that the allegations were either false or grossly exaggerated. See Tracy v. New Milford Public Schools, supra, 101 Conn.App. at 568, 922 A.2d 280 (trial court properly granted motion to strike claim for intentional infliction of emotional distress on ground that "[s]ubjecting an employee to discipline without proper investigation [was] a far cry from fabricating disciplinary actions" [internal quotation marks omitted]). Indeed, although the plaintiff testified that the department ultimately found that the allegations against her were "unsubstantiated," the record does not reveal whether the department found that the plaintiff had never engaged in the alleged conduct or, instead, that the conduct did not rise to the level of abuse. The record does reveal, however, that the department had found that the plaintiff's manner of physical contact with students was one of several "areas of concern...." See footnote 12 of this opinion.
Moreover, Ramos, who made the decision to place the plaintiff on administrative leave, testified that he was not aware of the plaintiff's history in the school system and, therefore, had no motive to retaliate against her. There was no contrary evidence that Ramos harbored personal animus toward the plaintiff. Even if we were to assume that Ramos made an error in judgment as to the truth or seriousness of the allegations, or in the manner in which he responded to them, and that the plaintiff was subject to extreme embarrassment as the result of his conduct, as a matter of law, mere errors in judgment do not rise to the level of extreme and outrageous conduct. See Appleton v. Board of Education, supra, 254 Conn. at 210-11, 757 A.2d 1059 (trial court properly granted defendant's motion for summary judgment on plaintiff's claim for intentional infliction of emotional distress when defendants forced plaintiff to take leave of absence, suspended plaintiff, and forced plaintiff to resign); Tracy v. New Milford Public Schools, supra, 101 Conn. App. at 568-69, 922 A.2d 280 (initiating disciplinary action without conducting investigation did not constitute extreme and outrageous conduct). We therefore conclude that the trial court improperly denied the defendants' motion for a directed verdict on the plaintiff's claim for intentional infliction of extreme emotional distress.
*103 The judgment is reversed and the case is remanded with direction to grant the defendants' motion for a directed verdict, to set aside the verdict and for judgment notwithstanding the verdict, and to render judgment thereon for the defendants.
In this opinion NORCOTT, ZARELLA, McLACHLAN, EVELEIGH and HARPER, Js., concurred.
PALMER, J., concurring.
I join parts I B, II and III of the majority opinion. I also join that portion of part I A of the majority opinion in which the majority concludes that Garcetti v. Ceballos, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), entitles the defendants, the board of education of the city of Bridgeport, Henry R. Kelly and Daniel Shamas, to judgment as a matter of law on the claim of the plaintiff, Carmen I. Perez-Dickson, alleging a violation of her first amendment right to free speech in contravention of General Statutes § 31-51q. Although I also agree with the conclusion of the majority in part I A of its opinion that the plaintiff is not entitled to review of her unpreserved alternative ground for affirmance under § 31-51q that the defendants violated her free speech rights under the state constitution, I am unable to join that portion of part I A of the majority opinion because I disagree with certain aspects of the majority's reasoning and analysis. Specifically, I do not agree with the majority that (1) the Golding doctrine[1] is inapplicable to unpreserved claims under § 31-51q, (2) an appellant ordinarily is not entitled to review of an unpreserved alternative ground for affirmance even if the appellee will not be prejudiced by such review, and (3) the possibility that the appellee might have settled the case prior to trial if it had known of the appellant's alternative ground for affirmance constitutes prejudice for purposes of determining whether the appellant should be granted appellate review of that alternative ground. I nevertheless concur in the result that the majority reaches in part I A because I agree with the defendants that the plaintiff has failed to establish that the defendants would not be prejudiced by review of the plaintiff's unpreserved claim.

I
The majority concludes that the plaintiff's unpreserved alternative ground for affirmance under § 31-51q may not be *104 brought under Golding because the plaintiff "has not raised a claim that the defendants violated her constitutional rights" but, instead, "has raised a claim implicating her statutory rights under § 31-51q."[2] Footnote 23 of the majority opinion. The majority's conclusion represents a classic example of elevation of form over substance. As this court has observed, the rationale for the Golding doctrine is that, when the trial record is adequate for appellate review, a party should be able to raise an unpreserved constitutional claim because such claims "implicate fundamental rights...." State v. Brunetti, 279 Conn. 39, 55, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S.Ct. 1328, 167 L.Ed.2d 85 (2007). In light of this rationale, there simply is no justification for denying Golding review to an unpreserved claim under § 31-51q, a statute that provides a remedy for violations of constitutional rights.
General Statutes § 31-51q provides in relevant part that "[a]ny employer ... who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution[3] or section 3,[4] 4[5] or 14[6] of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance of the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge...." It is apparent, therefore, that "[§] 31-51q creates a cause of action for damages to protect employees from retaliatory action illegally grounded in the employees' exercise of enumerated constitutionally protected rights." D'Angelo v. McGoldrick, 239 Conn. 356, 360, 685 A.2d 319 (1996). In other words, "[t]he statute plainly was intended to protect the first amendment and related state constitutional rights of working men and women." Cotto v. United Technologies Corp., 251 Conn. 1, 8, 738 A.2d 623 (1999). The purpose of § 31-51q, therefore, is to provide a mechanism pursuant to which an employee may vindicate certain of his or her federal and state constitutional rights. *105 Because the rights protected by § 31-51q are all constitutional in nature, for present purposes, there is no appreciable difference between a claim under § 31-51q and a claim raised directly under the federal or state constitution. See, e.g., Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 397, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (recognizing private cause of action under United States constitution for alleged violation of fourth amendment's prohibition against unreasonable searches and seizures); Binette v. Sabo, 244 Conn. 23, 41, 710 A.2d 688 (1998) (recognizing private cause of action under Connecticut constitution, article first, §§ 7 and 9, for alleged violation of prohibition against unreasonable searches and seizures). Section 31-51q is similar to 42 U.S.C. § 1983, which provides a remedy for, inter alia, "the deprivation of any rights, privileges, or immunities secured by the Constitution...." I see no reason why an unpreserved claim under 42 U.S.C. § 1983 should not warrant Golding review. Under the majority's formalistic analysis, however, no such review would be permitted because, even though 42 U.S.C. § 1983 protects constitutional rights, it is a statutory provision, not a constitutional one.

II
I also disagree with the majority's conclusion concerning the proper standard for determining the review-ability of an unpreserved alternative ground for affirmance. The majority declines to address the plaintiff's alternative ground for affirmance under § 31-51q in large part because the plaintiff did not raise the claim in the trial court and there are no "exceptional circumstances" warranting this court's review of the claim. Unlike the majority, I would conclude that an appellate court ordinarily should consider an unpreserved alternative ground for affirmance if the record is adequate for review and the appellee can establish that the appellant will not be prejudiced by such review.[7] Under such circumstances, considering an appellee's alternative ground for affirmance would preserve the finality of judgments and promote judicial economy without perpetrating a wrong on the appellant or on the trial court.
In reaching a stricter conclusion, the majority hews to an approach that this court adopted without any real analysis and to which this court has not consistently adhered. The majority notes that "[t]his court previously has held that [o]nly in [the] most exceptional circumstances can and will this court consider a claim, constitutional or otherwise, that has not been raised and decided in the trial court.... This rule applies equally to alternate grounds for affirmance.... New Haven v. Bonner, 272 Conn. 489, 498, 863 A.2d 680 (2005); see also Thomas v. West Haven, 249 Conn. 385, 390 n. 11, 734 A.2d 535 (1999) ([t]he appellee's right to file a [Practice Book] § 63-4[a][1][8] statement *106 has not eliminated the duty to have raised the issue in the trial court ...), cert. denied, 528 U.S. 1187, 120 S.Ct. 1239, 146 L.Ed.2d 99 (2000); Peck v. Jacquemin, 196 Conn. 53, 62 n. 13, 491 A.2d 1043 (1985) (compliance with [Practice Book § 63-4(a)(1)] is not to be considered in a vacuum; particularly to be considered is its linkage with [Practice Book § 60-5] which provides in part that this court shall not be bound to consider a claim unless it was distinctly raised at trial or arose subsequent to trial). Such exceptional circumstances may occur where a new and unforeseen constitutional right has arisen between the time of trial and appeal or where the record supports a claim that a litigant has been deprived of a fundamental constitutional right and a fair trial.... An exception may also be made where consideration of the question is in the interest of public welfare or of justice between the parties.... Lopiano v. Lopiano, 247 Conn. 356, 373, 752 A.2d 1000 (1998)." (Internal quotation marks omitted.) Finding no such exceptional circumstances in the present case, the majority concludes that the plaintiff is not entitled to review of her claim.[9]
I do not dispute that the cases that the majority citesBonner, Thomas and Pecksay what the majority says they do. I nevertheless believe that these cases should not drive this court's policy concerning appellate review of unpreserved alternative grounds for affirmance, first, because the strict approach endorsed by these cases is not the most efficacious one and was adopted without any real analysis, and, second, because we have not consistently adhered to that strict approach.
As we observed in Bonner, Thomas and Peck, under our rules, this court is never required to address unpreserved claims. See New Haven v. Bonner, supra, 272 Conn. at 498, 863 A.2d 680; Thomas v. West Haven, supra, 249 Conn. at 390 n. 11, 734 A.2d 535; Peck v. Jacquemin, supra, 196 Conn. at 61-62 n. 13, 491 A.2d 1043. Practice Book § 60-5 expressly provides that the reviewing court "shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial." By its broad terms, Practice Book § 60-5 applies to all unpreserved claims, whether the claim has been raised for the first time on appeal by the appellant seeking reversal of the judgment or has been raised for the first time on appeal by the appellee seeking affirmance of the judgment, as in Bonner, Thomas and Peck. See New Haven v. Bonner, supra, at 498, 863 A.2d 680; Thomas v. West Haven, supra, at 390 n. 11, 734 A.2d 535; Peck v. Jacquemin, supra, at 61-62 n. 13, 491 A.2d 1043. In none of those cases, however, did this court engage in any analysis or discussion as to why a reviewing court should treat all unpreserved claims alike irrespective of whether the claim was raised by the appellee or the appellant. In *107 fact, there is sound reason to treat the former more liberally than the latter.
The general rule disfavoring review of claims raised by the appellant for the first time on appeal stems from the concern that any other rule would be unfair to the trial court and to the opposing party. "[I]t is the appellant's responsibility to present... a claim clearly to the trial court so that the trial court may consider it and, if it is meritorious, take appropriate action. That is the basis for the requirement that ordinarily [the appellant] must raise in the trial court the issues that he intends to raise on appeal.... For us [t]o review [a] claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge.... We have repeatedly indicated our disfavor with the failure, whether because of a mistake of law, inattention or design, to object to errors occurring in the course of a trial until it is too late for them to be corrected, and thereafter, if the outcome of the trial proves unsatisfactory, with the assignment of such errors as grounds of appeal." (Internal quotation marks omitted.) Ravetto v. Triton Thalassic Technologies, Inc., 285 Conn. 716, 730, 941 A.2d 309 (2008).
Consequently, as this court has recognized, it is prudent to permit appellate review of an appellant's unpreserved claims only in exceptional circumstances. Claims that satisfy that stringent standard include claims of constitutional magnitude; see, e.g., State v. Golding, 213 Conn. 233, 239, 567 A.2d 823 (1989); claims involving the commission of plain error; see, e.g., Crawford v. Commissioner of Correction, 294 Conn. 165, 204-205, 982 A.2d 620 (2009); and claims implicating the court's subject matter jurisdiction. See, e.g., Gordon v. H.N.S. Management Co., 272 Conn. 81, 101, 861 A.2d 1160 (2004).
When an appellee, rather than an appellant, raises a claim for the first time on appeal, the claim, if successful, would preserve the judgment, not upset it. In such a circumstance, there is no possibility of an ambuscade of the trial court because the claim represents a separate and independent alternative ground on which the trial court's judgment may be affirmed. In the event that the appellant will not be prejudiced by review of the appellee's unpreserved claim, there is no persuasive reason to deny such review, and good reason to afford it. After all, a trial is a search for the truth conducted for the sake of resolving the parties' dispute. See, e.g., Nix v. Whiteside, 475 U.S. 157, 166, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) ("the very nature of a trial [is] a search for truth"); Miller v. Drouin, 183 Conn. 189, 191, 438 A.2d 863 (1981) ("[a] trial is a search for truth"). Once a trial has been held and judgment rendered, granting review of an unpreserved alternative ground for affirmance furthers the public interest in preserving a legally correct judgment, an interest that is founded on two important and closely related principles, namely, the finality of judgments and judicial economy.[10] See, e.g., Sawicki v. New Britain General Hospital, 302 Conn. 514, 522, 29 A.3d 453 (2011) ("[t]he [courts have] a strong interest in the finality of judgments" [internal quotation marks omitted]); Sikorsky Aircraft Corp. v. Commissioner of Revenue Services, 297 Conn. 540, 544-45, 1 A.3d 1033 (2010) (recognizing "judicial policy in favor of judicial economy" [internal quotation marks omitted]); *108 see also LaSalla v. Doctor's Associates, Inc., 278 Conn. 578, 587, 898 A.2d 803 (2006) (recognizing "closely related" interests of judicial economy and finality of judgments). Appellate review should be denied only if the record is inadequate for review of the unpreserved claim or the appellant would be prejudiced by consideration of the claim because he did not have the opportunity to address the claim in the trial court, in which case, the validity of the judgment itself would be in doubt.[11]
Consistent with the foregoing considerations, "when the trial court reaches a correct decision but on mistaken grounds, this court has repeatedly sustained the trial court's action if proper grounds exist to support it." (Internal quotation marks omitted.) State v. Colon, 272 Conn. 106, 187-88, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S.Ct. 102, 163 L.Ed.2d 116 (2005); accord Kelley v. Bonney, 221 Conn. 549, 592, 606 A.2d 693 (1992); Morris v. Costa, 174 Conn. 592, 597-98, 392 A.2d 468 (1978). Indeed, we sometimes have addressed such alternative grounds even though they were not raised in the trial court and no exceptional circumstances existed to justify appellate review; see, e.g., State v. Jacobson, 283 Conn. 618, 629 n. 13, 930 A.2d 628 (2007); and we often have considered an appellee's alternative claim in support of affirming the judgment without reference to whether the claim first had been raised in the trial court. See, e.g., Hopkins v. O'Connor, 282 Conn. 821, 827, 925 A.2d 1030 (2007); State v. Colon, supra, at 187-88, 864 A.2d 666; State v. Perkins, 271 Conn. 218, 256, 856 A.2d 917 (2004); Lombardo's Ravioli Kitchen, Inc. v. Ryan, 268 Conn. 222, 238 n. 12, 842 A.2d 1089 (2004); Levandoski v. Cone, 267 Conn. 651, 658 n. 5, 841 A.2d 208 (2004); Kelley v. Bonney, supra, at 592, 606 A.2d 693; State v. Ruffin, 206 Conn. 678, 683, 539 A.2d 144 (1988); Herrmann v. Summer Plaza Corp., 201 Conn. 263, 273-74, 513 A.2d 1211 (1986); Morris v. Costa, supra, at 597-98, 392 A.2d 468. This court's failure even to mention the preservation issue in those cases suggests that the issue frequently has been a matter of some indifference to this court and that the critical factors for determining the propriety of appellate review are the adequacy of the record and whether the appellant would be prejudiced by consideration of the claim. As we stated nearly sixty years ago, "[t]hat the [trial] court relied [on] a wrong theory does not render the judgment erroneous. A judgment responsive to the issues and supported by the facts should stand, even if the court's method of reaching its decision might be questionable.... To remand the case for a new trial is unnecessary. It is only prejudicial error which requires that course."[12] (Citations omitted; emphasis added.) Malone v. Steinberg, 138 Conn. 718, 723, 89 A.2d 213 (1952).
I also note that, when an appellee has raised a claim in the trial court, a reviewing *109 court will consider the claim as an alternative ground for affirmance, if the trial court did not address the claim, provided the record is adequate for review. See, e.g., King v. Sultar, 253 Conn. 429, 448-50, 754 A.2d 782 (2000). In such cases, the trial court record is incomplete, but the record nevertheless is sufficient for review. In cases in which the appellee has raised the alternative ground for affirmance for the first time on appeal, the record also is incomplete, but, if the record is adequate for review and consideration of the claim will not prejudice the appellant, the only reason to deny review is to sanction the appellee for his failure to raise the claim in the trial court. Although it is always preferable for parties to raise all of their claims in the trial court, I believe that the public and institutional interest in promoting judicial economy and the finality of judgments substantially outweighs any possible benefit that may be achieved by declining to review an alternative ground for affirmance solely as punishment for the appellee's failure to have raised the claim in the trial court.[13]
Finally, Practice Book § 63-4(a)(1) provides in relevant part: "If any appellee wishes to (A) present for review alternate grounds upon which the judgment may be affirmed ... that appellee shall file a preliminary statement of issues within twenty days from the filing of the appellant's preliminary statement of the issues...." Although Practice Book § 63-4(a)(1) speaks in mandatory terms, this court has "refused to consider an issue not contained in a preliminary statement of issues only in cases in which the opposing party would be prejudiced by consideration of the issue." (Emphasis added; internal quotation marks omitted.) State v. Cruz, 269 Conn. 97, 99 n. 2, 848 A.2d 445 (2004); see also Pelletier v. Sordoni/Skanska Construction Co., 286 Conn. 563, 588 n. 35, 945 A.2d 388 (2008). I see no reason why we should not adopt the same policy in cases involving an alternative ground for affirmance that was not raised in the trial court. The reviewing court should address the appellee's unpreserved claim upon a showing by the appellee both that the record is adequate for review and that the appellant will not be prejudiced by consideration of the unpreserved claim.

III
In concluding that the defendants would be prejudiced by our review of the plaintiff's unpreserved alternative ground for affirmance, the majority asserts that "affirming the ... award [of damages] for the plaintiff's [state constitutional] claim pursuant to § 31-51q would prejudice the defendants because the plaintiff's failure to raise [that claim] in [the trial court] ... deprived them of the opportunity to evaluate and possibly to settle the claim before the jury returned its verdict." Text accompanying footnote 27 of the majority opinion. Unlike the majority, I believe that considerations pertaining to the counterfactual settlement of a case have no bearing on the issue of whether an appellant would be prejudiced by appellate review of an appellee's unpreserved claim.
The decision whether to settle a case ordinarily is influenced by many diverse factors. Undoubtedly, one such factor is the strength of the opposing party's case. The more that a party knows about the other party's case, the better the former can evaluate the advantages and disadvantages *110 of settlement. But no matter how straightforward a case might seem, almost any such evaluation is complicated and multifaceted. Consequently, there is no reason why this court should presume that, in any given case, the likelihood of settlement would have increased if only the appellee had not failed to raise its alternative ground for affirmance in the trial court. There simply is no way to determine whether the appellee would have had any interest in settling, let alone an interest in settling on terms agreeable to the appellant. In light of the multitude of factors in the settlement equation, it is mere speculation for the majority to conclude that an appellant likely will be prejudiced in its opportunity to settle the case merely because the appellee did not raise its alternative ground for affirmance in the trial court. We should not deprive the appellee of an opportunity to raise an alternative ground for affirmance on the basis of such conjecture. Moreover, because it always can be said that an appellee's failure to raise its alternative ground for affirmance in the trial court conceivably might have affected the appellant's willingness to attempt to settle the case, the majority effectively bars appellate review of unpreserved alternative grounds for affirmance in all future cases. There is no legitimate reason to create such a bad policy.
In addition, this court ordered the parties to file supplemental briefs on the following question: "Under the facts of this case, are the defendants prejudiced if this court considers the unpreserved issue of whether the plaintiff's speech was protected under the state constitution?" The defendants responded in the affirmative and identified several ways in which they would be prejudiced by this court's review of the plaintiff's unpreserved state constitutional claim. Not surprisingly, the defendants themselves did not contend that they were prejudiced because the plaintiff's failure to raise that claim in the trial court deprived them of a meaningful opportunity to settle the case. For these reasons, I cannot agree with the majority's refusal to review the plaintiff's unpreserved claim on the wholly speculative ground that the defendants were prejudiced because their "opportunity to evaluate and possibly to settle the claim before the jury returned its verdict" might have been impaired.
I do agree with the defendants, however, that the plaintiff cannot establish that the defendants would not be prejudiced by this court's review of the plaintiff's unpreserved claim. In particular, I agree with the defendants' contention that, because they had an airtight defense to the plaintiff's federal constitutional claimas the plaintiff now concedes, under Garcetti v. Ceballos, supra, 547 U.S. at 410, 126 S.Ct. 1951, she was required but failed to prove that her allegedly protected speech, namely, her reports of abuse to the state department of children and families (department), was not made in her official capacitythey had no reason to adduce any evidence of the plaintiff's motivation in making those reports. Even if it is assumed, arguendo, that the plaintiff's free speech rights are broader under the state constitution than under the federal constitution, § 31-51q "applies only to expressions regarding public concerns that are motivated by an employee's desire to speak out as a citizen." Cotto v. United Technologies Corp., supra, 251 Conn. at 17, 738 A.2d 623. The defendants, however, had no occasion to present evidence that the plaintiff's speech was motivated not by a desire to speak out as a private citizen but, rather, by a desire merely to comply with her legal duty as a mandated *111 reporter.[14] The defendants surely would have introduced evidence tending to prove the latter if the plaintiff had raised a constitutional claim that was not otherwise barred by Garcetti. In such circumstances, the plaintiff cannot meet her burden of demonstrating that the defendants were not prejudiced by her failure to raise her state constitutional claim in the trial court.
Accordingly, I concur in the result that the majority reaches in part I A of its opinion. I otherwise join the majority opinion.
NOTES
[1] Although the caption of the present case refers to the City of Bridgeport et al., the real party in interest is the board. Also named as defendants at trial were the Connecticut Education Association, Jack Reh, the Bridgeport Education Association, Mary Loftus Levine, the department of children and families and Maria Melendez. Because these defendants are not involved in the present appeal, references to the defendants are to the board, Kelly and Shamas.
[2] The first amendment to the United States constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."
[3] The constitution of Connecticut, article first, § 3, provides: "The exercise and enjoyment of religious profession and worship, without discrimination, shall forever be free to all persons in the state; provided, that the right hereby declared and established, shall not be so construed as to excuse acts of licentiousness, or to justify practices inconsistent with the peace and safety of the state."

The constitution of Connecticut, article first, § 4, provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."
The constitution of Connecticut, article first, § 14, provides: "The citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance."
[4] General Statutes § 31-51q provides in relevant part: "Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages...."
[5] General Statutes § 17a-101e provides in relevant part: "(a) No employer shall discharge, or in any manner discriminate or retaliate against, any employee who in good faith makes a report pursuant to sections 17a-101a to 17a-101d, inclusive, and 17a-103, testifies or is about to testify in any proceeding involving child abuse or neglect. The Attorney General may bring an action in Superior Court against an employer who violates this subsection. The court may assess a civil penalty of not more than two thousand five hundred dollars and may order such other equitable relief as the court deems appropriate...."
[6] Section 1981(a) of title 42 of the United States Code provides in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...."
[7] Section 1983 of title 42 of the United States Code provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."
[8] The defendants appealed to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199(c) and Practice Book § 65-1.
[9] Accordingly, we need not reach the defendants' other claims or the plaintiff's claims on cross appeal.
[10] The plaintiff testified at trial that a small group of disgruntled teachers had resisted her efforts to improve the academic situation at Beardsley School. These efforts included prohibiting teachers from showing movies or videos in the classroom unless they were related to the subject being taught, visiting each classroom every day to ensure that the teachers were following lesson plans, prohibiting teachers from eating snacks in the class room and being an advocate for the children.
[11] Kelly testified that Carroll had informed him about the accusations against the plaintiff and he, in turn, had informed Ramos. Kelly asked to be recused from any investigatory process because of his involvement in the present litigation, which was initiated in 2000.
[12] John Di Donato, the assistant superintendent for youth development for the school district, wrote a letter to the plaintiff on February 28, 2006, indicating that three reports had been filed with the department concerning the plaintiff's conduct with students, and that he had met with the plaintiff to discuss the reports. Di Donato stated that the department "could not substantiate the allegations contained in the ... reports. However, I noted [at the meeting with the plaintiff] that their findings did include a number of areas of concern," including the plaintiff's physical contact with students. Di Donato stated that he had advised the plaintiff "to limit [her] physical contact with students," and had warned her that failure to comply with this instruction could result in further disciplinary action, including separation from employment.
[13] Specifically, the plaintiff claimed that Kelly had interfered with her efforts to evaluate and discipline teachers and staff members at Beardsley School, had denied her requests to participate in programs for professional development and her requests for adequate staffing and supplies, had subjected her to disciplinary measures to which other principals had not been subjected, had subjected her to threats of official discipline by the board's attorneys, had demoted her unjustifiably and had unfairly evaluated her work performance.
[14] In support of this argument, the defendants relied on Pagani v. Board of Education, United States District Court, Docket No. 3:05-CV-01115 JCH, 2006 WL 3791405 (D.Conn. December 19, 2006). In that case, the District Court held that, under Garcetti, the plaintiff's conduct in reporting the abusive conduct of a fellow teacher to the department was undertaken as a teacher performing an official duty and, therefore, was not protected under the first amendment. Accordingly, the court concluded that the plaintiff could not prevail in his retaliation claim pursuant to federal law.
[15] In support of this argument, the plaintiff relied on the trial court's decision in Schumann v. Dianon Systems, Inc., Superior Court, judicial district of Fairfield, Docket No. CV-05-5000747-S, 2007 WL 2938615 (September 24, 2007). The court in Schumann noted that there was a split among the decisions of the Superior Court as to whether Garcetti applied to speech made by a private employee, but concluded that it need not decide that question in order to rule on the defendant's motion for summary judgment because there was a genuine issue of material fact as to whether the plaintiff's statements had been made as part of his official job duties. See also St. Fleur v. R.C. Bigelow, Inc., Superior Court, judicial district of Fairfield, Docket No. CV-06-5004575-S, 2007 WL 1247306 (April 16, 2007) (same). Thus, neither Schumann nor St. Fleur supports the plaintiff's argument to the trial court in the present case that Garcetti does not apply to claims made pursuant to § 31-51q that implicate the exercise of first amendment rights. Indeed, as the defendants point out, there is no authority to support that argument and the plaintiff has not renewed it on appeal.

The trial court in Schumann ultimately concluded that Garcetti does not apply to private employers and, after a jury trial, rendered judgment for the plaintiff. In Schumann v. Dianon Systems, Inc., 304 Conn. 585, 43 A.3d 111 (2012), which was released on the same date as this opinion, this court concluded that Garcetti does apply to claims against private employers pursuant to § 31-51q and reversed the judgment of the trial court.
[16] Thereafter, the defendants filed a motion for articulation of, among other things, the trial court's reasons for rejecting their claim pursuant to Garcetti, which the trial court denied. The defendants then filed in this court a motion for review of the trial court's denial of their motion for articulation, which this court denied in relevant part.
[17] After this appeal and cross appeal were filed, we granted the application of the Connecticut Employment Lawyers Association to file an amicus curiae brief in support of the plaintiff's position in her claim pursuant to § 31-51q.
[18] The trial court submitted two interrogatories to the jury in connection with the plaintiff's claims of retaliation. The first interrogatory asked: "Has [the plaintiff] proven by a preponderance of the evidence that [the defendants] retaliated against her for filing reports of child abuse with [the department] taken against her prior to 2005?" The second interrogatory asked: "Has [the plaintiff] proven by a preponderance of the evidence that [the defendants] retaliated against her when she was placed on administrative leave on November 29, 2005, allegedly for student abuse?" The interrogatories did not specify the statute under which the claims of retaliation were being brought. The plaintiff claims on appeal that the jury reasonably could have answered "yes" to both questions pursuant to either § 31-51q or § 17a-101e. Accordingly, we address the defendants' claims relating to both statutes together.
[19] The plaintiff contends that this claim was not preserved for review because, even though the defendants cited Garcetti in both their oral motion for a directed verdict and in their posttrial motion for a directed verdict, their argument was not that a public employee's speech pursuant to official job duties is not protected by the first amendment per se, but that such speech is not a matter of public concern. We conclude that the defendants adequately put the plaintiff and the trial court on notice of the nature of their claim pursuant to Garcetti v. Ceballos, supra, 547 U.S. at 421, 126 S.Ct. 1951, by arguing that "`when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for [f]irst [a]mendment purposes....'" Moreover, the holding of Garcetti that a public employee's speech pursuant to official job duties is not constitutionally protected is unmistakably clear upon a simple reading of that case.

The trial court instructed the jury that, in order to find that the plaintiff's speech was constitutionally protected, it must find that "her activity constituted a matter of public concern." In addition, the court instructed the jury that, pursuant to § 31-51q, it must find that the plaintiff's "activity did not substantially or materially interfere with her bona fide job performance or the working relationship between herself and the defendants." Although the basis for the court's "public concern" instruction is not entirely clear, the United States Supreme Court, before it decided Garcetti, held that speech by a public employee is constitutionally protected only if the speech is on a matter of public concern and the employee's free speech interest is not outweighed by the interest of the employer "in promoting the efficiency of the public services it performs through its employees." Connick v. Myers, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); see also DiMartino v. Richens, 263 Conn. 639, 664-67, 822 A.2d 205 (2003). We emphasize that we express no opinion here as to whether the court in Garcetti modified the Connick standard or whether it simply applied its precedent for the first time to speech by a public employee pursuant to his or her job duties. Although the defendants in the present case did not object to the jury instruction after it was given, it was implicit in their motion for a directed verdict that the jury should not receive any instruction on the plaintiff's claim pursuant to § 31-51q because the claim was barred as a matter of law under Garcetti.
[20] The amicus argues that, when an employer has violated General Statutes § 31-51m, which prohibits employers from retaliating against their employees for whistle-blowing activities, the violation can form the basis of a claim pursuant to § 31-51q, even if the employee was not exercising constitutional speech rights. We disagree. The remedy provided by § 31-51q plainly and unambiguously is limited to cases in which an employee has disciplined or discharged an employee "on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state...." In any event, the plaintiff has not claimed that the defendants violated § 31-51m.
[21] Although this principle is one of appellate review, we see no reason why the trial court should not also be entitled to assume that the state constitution and the federal constitution are coextensive in the absence of any claim to the contrary by the party raising the constitutional issue.
[22] The plaintiff in the present case did not file a statement of alternate grounds on which the judgment could be affirmed in compliance with Practice Book § 63-4(a)(1). This court generally has reviewed alternate grounds for affirmance even though the appellee has not complied with the requirement to identify such claims in a preliminary statement, when doing so would not prejudice the appellant. See Connecticut Ins. Guaranty Assn. v. Fontaine, 278 Conn. 779, 784 n. 4, 900 A.2d 18 (2006) (when alternate ground for affirmance was raised in trial court, failure to comply with Practice Book § 63-4[a][1] did not render claim unreviewable when all parties briefed claim); Skuzinski v. Bouchard Fuels, Inc., 240 Conn. 694, 702-703, 694 A.2d 788 (1997) (reviewing alternate grounds for affirmance that were raised in trial court even though trial court failed to rule on claims); Chotkowski v. State, 240 Conn. 246, 256 and n. 17, 690 A.2d 368 (1997) (reviewing alternate grounds for affirmance that were not included in preliminary statement of issues when claims were raised in trial court); cf. State v. Cruz, 269 Conn. 97, 98-99, 848 A.2d 445 (2004) (reviewing state's alternate ground for affirming Appellate Court's judgment, even though state had not expressly raised as alternate ground for affirmance, without addressing question of whether claim had been raised in Appellate Court); Stepney Pond Estates, Ltd. v. Monroe, 260 Conn. 406, 423 n. 19, 797 A.2d 494 (2002) (alternate grounds for affirmance that plaintiff had not expressly characterized as such were reviewable when claims had been fully briefed; court did not address question of whether claims had been raised in trial court); Stepney Pond Estates, Ltd. v. Monroe, supra, at 420 and n. 15, 797 A.2d 494 (at least some alternate grounds for affirmance had been raised in trial court); Culver v. Culver, 127 Conn.App. 236, 252-53, 17 A.3d 1048 (reviewing alternate grounds for affirmance that had not been expressly characterized as such without addressing question of whether claims had been raised in trial court), cert. denied, 301 Conn. 929, 23 A.3d 724 (2011); Mannweiler v. LaFlamme, 65 Conn.App. 26, 34 n. 6, 781 A.2d 497 (2001) (same). We have reviewed alternate grounds for affirmance that were not raised in the trial court, however, only in exceptional cases. See footnote 23 of this opinion.
[23] See, e.g., Vine v. Zoning Board of Appeals, 281 Conn. 553, 568-70, 916 A.2d 5 (2007) (addressing unpreserved alternate ground for affirmance when failure to do so would have been unfair because appellant relied on factual basis for alternate ground for affirmance in support of her claim on appeal, claim involved pure question of law, there was no possibility that court would be usurping discretion of decision maker, record was adequate for review and, because issue had been fully briefed, there was no possibility of prejudice to parties); State v. Osuch, 124 Conn. App. 572, 580, 5 A.3d 976 (reviewing alternate ground for affirmance that could not have been raised in trial court because issue did not arise until after judgment), cert. denied, 299 Conn. 918, 10 A.3d 1052 (2010); see also Gerardi v. Bridgeport, 294 Conn. 461, 466-67, 985 A.2d 328 (2010) (reviewing alternate ground for affirmance that was not raised in trial court when claim implicated trial court's subject matter jurisdiction, which may be raised at any time).

This court also has addressed unpreserved claims raised as alternate grounds for affirmance in criminal cases under State v. Golding, 213 Conn. 233, 239-40, 567 A.2d 823 (1989). See, e.g., State v. Singleton, 292 Conn. 734, 759, 974 A.2d 679 (2009). Although Golding had been applied in civil cases; see Bennett v. New Milford Hospital, Inc., 300 Conn. 1, 32, 12 A.3d 865 (2011); the plaintiff in the present case has not requested Golding review. More fundamentally, although the plaintiff's claim implicates her constitutional speech rights because her employer is public, she has not raised a claim that the defendants violated her constitutional rights, but instead has raised a claim implicating her statutory rights under § 31-51q. Accordingly, Golding does not apply. See State v. Golding, supra, at 239-40, 567 A.2d 823 (to be reviewable under Golding, claim must be of constitutional magnitude).
[24] See footnote 23 of this opinion.
[25] After oral argument before this court, we ordered the parties to submit supplemental briefs on the following questions: (1) Under the facts of this case are the defendants prejudiced if this court considers the unpreserved issue of whether the plaintiff's speech was protected under the state constitution?; and (2) When an appellee has raised, for the first time on appeal, an alternative ground for affirmance, who has the burden of demonstrating prejudice or lack thereof? Because the plaintiff is asking for an exception to the general rule that we will not review claims that were not raised in the trial court, we conclude that the burden is on the plaintiff to prove that the defendants will not be prejudiced by our review of the claim. For the reasons stated in this opinion, we conclude that the plaintiff has not met that burden.

The plaintiff contends, however, that "[i]t was never [her] obligation ... to raise in the trial court or in this appeal as an alternate ground for affirmance the issue of whether her speech was protected because the issue, as raised by the defendants, clearly is subsumed within and is completely intertwined with [§] 31-51q ...." The plaintiff also makes the remarkable claim that she would be prejudiced if this court were to consider the defendants' arguments against her unpreserved claim that the state constitution is broader than the federal constitution in this context because the defendants did not claim at trial that her claim pursuant to § 31-51q is barred by the state constitution. The plaintiff fails to recognize that the defendants were entitled to assume that the scope of the state constitution is coextensive with the scope of the federal constitution in the absence of any claim to the contrary. State v. Gore, supra, 288 Conn. at 776 n. 7 [955 A.2d 1].
[26] Pursuant to the trial court's instruction, the jury could render a verdict for the plaintiff if it found that: (1) the plaintiff's speech was constitutionally protected because it constituted a matter of public concern; and (2) pursuant to § 31-51q, the plaintiff's "activity did not substantially or materially interfere with her bona fide job performance or the working relationship between herself and the defendants." See footnote 19 of this opinion. If a jury were instructed pursuant to Connick, however, it could find that the plaintiff's speech was not constitutionally protected in the first instance if it found that, although her speech constituted a matter of public concern, her free speech interest was outweighed by the defendants' interest in efficiently operating the school system. For example, the jury might find that, although the defendants had transferred the plaintiff at least in part because of her reports of abuse, they also did so because some teachers had become hostile to the plaintiff, thereby impairing her effectiveness in that particular school. In that case, the jury could not render a verdict for the plaintiff on her claims pursuant to § 31-51q, even if the plaintiff's conduct did not substantially interfere with her job performance or with her working relationship with the defendants. In addition, this court could conclude that, although Garcetti does not apply to claims under the state constitution, the Connick standard is too liberal as applied to speech pursuant to official job duties in light of the concerns raised in Garcetti. Cf. Wickwire v. State, 725 P.2d 695, 703 (Alaska 1986) (Connick balancing test applies under state constitution, although public concern criteria may be broader under state constitution than federal constitution; court did not consider whether employee's speech was pursuant to official duties); Kaye v. Board of Trustees of the San Diego County Public Law Library, 179 Cal.App.4th 48, 59, 101 Cal.Rptr.3d 456 (2009) (Garcetti applies under state constitution); Kemp v. Board of Agriculture, 790 P.2d 870, 872-73 (Colo.App.1989) (Connick balancing test applies under state constitution; court did not consider whether employee's speech was pursuant to official duties), aff'd, 803 P.2d 498 (Colo. 1990), cert. denied, 501 U.S. 1205, 111 S.Ct. 2798, 115 L.Ed.2d 972 (1991); Acevedo v. Muskogee, 897 P.2d 256, 265 (Okla.1995) (Opala, J., concurring) (arguing that, under Oklahoma constitution, before government may dismiss employee for speech, "government must demonstrate some overriding interest of vital importance in maintaining its efficiency, which outweighs any benefit to be derived from free speech" without considering whether employee's speech was pursuant to official duties [emphasis in original]); see also Edwards v. Dept. of Transportation, 66 Wash.App. 552, 559 n. 3, 832 P.2d 1332 (1992) (state balancing test that incorporated Connick provided adequate protection under state constitution; court did not consider whether employee's speech was pursuant to official duties).

We recognize that the defendants did not claim at trial or on appeal that the jury instructions were defective not only because the plaintiff's claim pursuant to § 31-51q was barred under Garcetti, but also because the instructions incorrectly stated the standard that predated Garcetti. As we have indicated, however, the defendants were not required to raise every possible defense to the plaintiff's § 31-51q claim if they believed that their Garcetti claim was dispositive. Because we agree that the defendants' claim pursuant to Garcetti is dispositive of the § 31-51q claim as it was actually litigated, the defendants should prevail on appeal unless the plaintiff can show that the defendants would not be prejudiced by an affirmance based on her unpreserved state constitutional claim because the trial court gave a proper jury instruction on that issue. Of course, if we had disagreed with the defendants' claim pursuant to Garcetti, any claim that the judgment of the trial court should be reversed because the jury instructions were improper for other reasons would be unpreserved.
[27] The specific amount awarded to the plaintiff on her claim pursuant to § 31-51q is not clear from the record because when the trial court found that the separate awards for noneconomic and punitive damages pursuant to this claim and the discrimination claim were duplicative and reduced the cumulative $1,000,000 award for both claims to $500,000, it did not allocate the new award between the claims.
[28] The defendants raised this claim in their oral motion for a directed verdict and in their posttrial motion for a directed verdict.
[29] In her fifth revised complaint, the plaintiff alleged that the defendants' conduct toward her in 1998 through 2000 had been motivated by racial discrimination. The jury interrogatories, however, allowed the jury to find that the defendants had engaged in racial discrimination only with respect to their response to the allegations of abuse against the plaintiff in 2005, when they placed the plaintiff on administrative leave. In addition, the trial court instructed the jury that "[t]he plaintiff claims that the defendants discriminated against her by putting her on administrative leave...." The court did not refer to the defendants' conduct in 1998 through 2000 in connection with its instructions on the plaintiff's claim of racial discrimination. Accordingly, the plaintiff has abandoned any claim that the defendants' conduct toward her in 1998 through 2000 was motivated by racial discrimination. Moreover, the plaintiff has made no argument on appeal that the defendants' conduct toward her in 1998 through 2000 would support a conclusion that they discriminated against her on the basis of her race in 2005, and she has pointed to no evidence that would support a finding that the defendants' conduct in 1998 through 2000 was motivated by racial discrimination and not by some other reason, proper or improper. See Fisher v. Vassar College, 114 F.3d 1332, 1338 (2d Cir. 1997) ("[i]f the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent").
[30] The plaintiff sought to present as evidence of this practice memoranda memorializing the board's investigatory efforts in seventeen cases of alleged abuse of a student by a school district employee. The trial court concluded that the memoranda were cumulative and that introducing them as evidence potentially could violate the privacy of the subjects of the investigation. The court allowed the plaintiff, however, to introduce one of the memoranda, in a redacted form, and to inform the jury that the other sixteen cases had been handled in a similar manner. The record does not reflect the races of the teachers or students involved in these seventeen cases.
[31] The plaintiff did not identify these two white female teachers by name.
[32] Carroll did not identify this school principal by name.
[33] Kelly testified that he became aware of the allegations against A.C. in the fall of 2005, and that he placed him on administrative leave immediately. Ramos testified that he became aware of the allegations against A.C. during the fall of 2005, and that Kelly conducted a meeting at which A.C. was placed on administrative leave. The plaintiff produced documentary evidence, however, showing that allegations of abuse had been made against A.C. in July, 2004. The evidence also showed that A.C. was placed on administrative leave on June 3, 2005, after an investigation established that he had violated the school district's sexual harassment policy. In addition, the evidence indicated that A.C. was assigned to the city of Bridgeport's administrative offices during his leave. Ramos testified that he became school superintendent on June 6, 2005. It is unclear from the record whether there were two separate allegations of abuse against A.C. and two separate administrative leaves, or whether Kelly and Ramos were mistaken about the dates that they had learned about the allegations and that A.C. had been placed on leave.
[34] In some employment contexts, such as claims involving hiring, promoting or granting tenure, the plaintiff must show that she was qualified to hold her employment position. Craine v. Trinity College, supra, 259 Conn. at 638, 791 A.2d 518. The test for establishing disparate treatment in employment cases is flexible, however. Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1264 (11th Cir.2010) ("[t]he methods of presenting a prima facie case [under McDonnell Douglas Corp.] are flexible and depend on the particular situation"). Because, in the present case, the question of whether the plaintiff was qualified for her position is not relevant to the question of whether she was subjected to harsher discipline than other employees on the basis of her race, we conclude that it is not an element of her prima facie case.
[35] See also Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1114-15 (10th Cir.2007) (in individual disparate treatment actions, "[s]tatistics taken in isolation are generally not probative of ... discrimination ... and statistical evidence on its own will rarely suffice to show pretext" [citation omitted; internal quotation marks omitted]); Bacon v. Honda of America Mfg., Inc., 370 F.3d 565, 575 (6th Cir.2004) (evidence showing pattern or practice of discrimination is not probative in individual disparate treatment action), cert. denied, 543 U.S. 1151, 125 S.Ct. 1334, 161 L.Ed.2d 115 (2005); Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 349 (7th Cir.1997) ("[s]tanding virtually alone ... statistics cannot establish a case of individual disparate treatment" [internal quotation marks omitted]); LeBlanc v. Great American Ins. Co., 6 F.3d 836, 848 (1st Cir.1993) ("statistical evidence in a disparate treatment case, in and of itself, rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision to dismiss an individual employee"), cert. denied, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994); Walther v. Lone Star Gas Co., 977 F.2d 161, 162 (5th Cir.1992) (in individual disparate treatment case, "proof of pretext, hence of discriminatory intent, by statistics alone would be a challenging endeavor" [emphasis in original]); Barnes v. GenCorp, Inc., 896 F.2d 1457, 1469 (6th Cir.1990) (The employer's reasons for its treatment of the plaintiffs "cannot be rebutted by reference to the statistics already presented [in support of the prima facie case when] the statistics... do not tend to establish that [membership in the protected class] played a factor in any particular decision. Unless the plaintiffs can show that the defendants' explanations are inherently suspect or can present other direct or circumstantial evidence suggesting that the proffered reasons are not true, then the defendants are entitled to summary judgment." [Emphasis in original.]), cert. denied, 498 U.S. 878, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990); Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1131 (11th Cir.1984) ("statistics alone cannot make a case of individual disparate treatment"); Hudson v. International Business Machines Corp., 620 F.2d 351, 355 (2d Cir.1980) (statistics, standing alone, cannot prove discrimination in individual disparate treatment action), cert. denied, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980); Ficken v. Clinton, 771 F.Supp.2d 79, 85-86 (D.D.C.2011) (in disparate treatment case, summary judgment for defendant is ordinarily appropriate if plaintiff relies solely on statistical evidence); Ivy v. Oxford Municipal Separate School District, United States District Court, Docket No. 3:10CV024-A-A (N.D.Miss. June 29, 2011) ("while statistical evidence could be relevant [in individual disparate treatment case], bare allegations and numbers alone without more context provided are not sufficient"); Reynolds v. Barrett, 741 F.Supp.2d 416, 427 (W.D.N.Y.2010) ("[s]tatistical evidence can be used to bolster an individual claim of disparate treatment, but [s]tatistics alone are insufficient in a disparate-treatment claim because an individual plaintiff must prove that he or she in particular has been discriminated against" [internal quotation marks omitted]); Booker v. Massachusetts Dept. of Public Health, 527 F.Supp.2d 216, 227 (D.Mass.2007) ("[s]tatistical evidence is of marginal assistance in a disparate treatment case because unless very powerful, it reveals little of an individual plaintiff's circumstances, particularly with respect to co-workers with whom she seeks to compare herself"), aff'd, 612 F.3d 34 (1st Cir.2010); Simpson v. Leavitt, 437 F.Supp.2d 95, 104 (D.D.C.2006) (statistics, standing alone, cannot prove discrimination in individual disparate treatment action); Bussey v. Phillips, 419 F.Supp.2d 569, 583 (S.D.N.Y. 2006) (same); Byrnie v. Cromwell Public Schools, 73 F.Supp.2d 204, 218 (D.Conn. 1999) (in individual disparate treatment case, "raw statistical data, in the absence of any effort to account for other causes of the under-representation of [members of the protected class in the class of persons employed by the defendant], does not support an inference of ... discrimination"), rev'd in part on other grounds, 243 F.3d 93 (2d Cir.2001).
[36] In addition, a number of courts have held that, for purposes of proving discriminatory intent in individual disparate treatment cases, "statistical evidence derived from an extremely small universe ... has little predictive value and must be disregarded." (Internal quotation marks omitted.) Aragon v. Republic Silver State Disposal, Inc., supra, 292 F.3d at 663; see also Mayor v. Educational Equality League, 415 U.S. 605, 621, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974) (in action for intentional discrimination in violation of equal protection clause, use of straight percentage comparison was meaningless because sample size was small); Pollis v. New School for Social Research, 132 F.3d 115, 121 (2d Cir.1997) (in individual disparate treatment case, "[t]he smaller the sample, the greater the likelihood that an observed pattern is attributable to other factors and accordingly the less persuasive the inference of discrimination to be drawn from it"); Harper v. Trans World Airlines, Inc., 525 F.2d 409, 412 (8th Cir. 1975) (statistical evidence derived from extremely small sample must be disregarded). The reason is that, when the number of comparators is small, "slight changes in the data can drastically alter the result." Aragon v. Republic Silver State Disposal, Inc., supra, at 663.
[37] The white employees to whom the plaintiff compares herself are: the teacher who Smith had asked the plaintiff to vouch for while she was the principal at Beardsley School; the teacher who the plaintiff had interviewed while she was the principal at Roosevelt School; the principals L.R. and A.E.; and the teachers V.L. and T.B.
[38] See Shumway v. United Parcel Service, Inc., supra, 118 F.3d at 64 (when plaintiff was disciplined by different supervisor than comparator employees who were treated less severely, and when plaintiff's supervisor treated all employees the same, plaintiff was not treated differently than others similarly situated); see also Radue v. Kimberly-Clark Corp., 219 F.3d 612, 618 (7th Cir.2000) (because different supervisors may exercise discretion differently, employee is rarely similarly situated to employee who has different supervisor).
[39] As we have indicated, the evidence was ambiguous as to whether Ramos had been involved in disciplining A.C. and whether A.C. was treated the same as the plaintiff. See footnote 33 of this opinion. The plaintiff does not dispute the defendants' claim that they treated A.C. the same as the plaintiff, however, and she expressly concedes that the defendants treated "similarly situated nonblack employees ... in the same manner as [the] plaintiff," although she did not identify these employees.
[40] Because the defendants articulated legitimate reasons for their treatment of the plaintiff, the burden was on her to establish by a preponderance of the evidence that the defendants were motivated by discrimination even if the jury disbelieved the defendants' reasons. Weinstock v. Columbia University, supra, 224 F.3d at 42; see also St. Mary's Honor Center v. Hicks, supra, 509 U.S. at 519, 113 S.Ct. 2742 ("[i]t is not enough ... to disbelieve the employer; the fact-finder must believe the plaintiff's explanation of intentional discrimination" [emphasis in original]).
[41] These employees are the six employees to whom the plaintiff seeks to compare herself; see footnote 37 of this opinion; and A.C., whom the jury reasonably could have concluded was treated more favorably than the plaintiff. See footnote 33 of this opinion.
[42] These employees are the male African-American principal who was accused in 2006, the plaintiff herself when she was accused in 2008, S.A. and J.A.
[43] The plaintiff cites Graham v. Long Island Rail Road, supra, 230 F.3d at 43-44, for the proposition that, when a plaintiff is relying solely on circumstantial statistical evidence to prove intentional discrimination, evidence that the employer has treated some employees of the plaintiff's race more favorably than the plaintiff, and that it has treated some employees of a different race the same, is not insufficient as a matter of law to prove that the employer was motivated by racial discrimination. In Graham, the court stated that, "[s]ince [the] principal focus [of Title VII of the Civil Rights Act of 1964 (Title VII)] is on protecting individuals, rather than a protected class as a whole, an employer may not escape liability for discriminating against a given employee on the basis of race simply because it can prove it treated other members of the employee's group favorably. See Connecticut v. Teal, 457 U.S. 440, 453-55, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982); [Equal Employment Opportunity Commission v. Staten Island Savings Bank], 207 F.3d 144, 151 & n. 5 (2d Cir.2000). Only where overwhelming evidence exists that an employer acted for reasons other than discrimination will the proof submitted by the plaintiff as to similarly situated employees be negated. Cf. Montana [v. First Federal Savings & Loan Assn. of Rochester, 869 F.2d 100, 106-107 (2d Cir. 1989)]...." Graham v. Long Island Rail Road, supra, at 43-44. Because Graham is inconsistent with the well reasoned cases holding that circumstantial statistical evidence is probative of intentional discrimination only when it shows a stark pattern of discrimination or a gross statistical disparity; see, e.g., Aragon v. Republic Silver State Disposal, Inc., supra, 292 F.3d at 663; Ottaviani v. State University of New York, supra, at 371; and because the cases cited by the court in Graham do not support that court's conclusion; see Connecticut v. Teal, supra, at 453-55, 102 S.Ct. 2525 (when plaintiff has established disparate impact claim under Title VII, employer cannot justify discrimination against plaintiff by establishing that it has treated other members of protected group more favorably); Equal Employment Opportunity Commission v. Staten Island Savings Bank, supra, at 151 and n. 5 (same); Montana v. First Federal Savings & Loan Assn. of Rochester, supra, at 107 (trial court properly granted summary judgment because evidence that defendant retained six male employees but did not retain plaintiff, without more, did not support finding of gender discrimination); we find Graham unpersuasive.
[44] Of course, if a plaintiff can point to direct evidence that the employer discriminated against him or her on the basis of race, the plaintiff need not establish any pattern of disparate treatment. We conclude only that, if a plaintiff is relying solely on circumstantial statistical evidence that the employer has treated him or her differently than similarly situated employees who are not in the protected class to prove discriminatory intent, and the evidence fails to show a stark pattern of discrimination, then the plaintiff has failed to prove an intent to discriminate as a matter of law.
[45] When a plaintiff attempts to satisfy the ultimate burden of proving discriminatory intent by presenting circumstantial evidence of disparate treatment, the plaintiff must show "that the better-treated workers with whom the plaintiff compares herself are a representative sample of all the workers who are comparable to her.... She must not pick and choose [comparators]." (Citations omitted.) Crawford v. Indiana Harbor Belt Railroad Co., 461 F.3d 844, 845 (7th Cir.2006); see also Simpson v. Kay Jewelers, 142 F.3d 639, 646-47 (3d Cir.1998) (to prove age discrimination, plaintiff cannot "pick and choose a person she perceives is a valid comparator who was allegedly treated more favorably, and completely ignore" other relevant comparators); Simpson v. Kay Jewelers, supra, at 645 (plaintiff cannot selectively choose comparator); Simpson v. Kay Jewelers, supra, at 645 ("the mere favorable treatment of [a member of an unprotected class] as compared to [a member of a protected class] may not be sufficient to infer ... discrimination"); Soria v. Ozinga Bros., Inc., 704 F.2d 990, 996 (7th Cir.1983) (in disparate treatment action, when sample included only fifteen recorded disciplinary actions and plaintiff chose to omit thirteen unwritten disciplinary incidents, trial court "was well justified in considering ... flawed and incomplete disciplinary statistics to be of `minimal assistance'"). These cases recognize that no rational inference of discriminatory intent can be made merely because the employer treated the plaintiff differently than some, arbitrarily selected, comparators; rather, the plaintiff must establish an overall pattern of disparate treatment based on membership in the protected class. Cf. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1088-89 (11th Cir.2004) (for purposes of establishing prima facie case of disparate treatment on basis of sex, evidence that two women were chosen for promotion out of forty-four open positions had no probative value when plaintiff had not provided other relevant information, such as number of women who sought promotion); Hillstrom v. Best Western TLC Hotel, 354 F.3d 27, 32 (1st Cir.2003) (for purposes of proving claim of disparate treatment on basis of age and gender, statistical evidence that 75 percent of individuals terminated by supervisor were over age of forty and 87 percent were male was not probative "absent evidence of the characteristics of the universe of employees supervised by [the supervisor]"); Montana v. First Federal Savings & Loan Assn. of Rochester, 869 F.2d 100, 107 (2d Cir.1989) (sex discrimination claim was properly dismissed when plaintiff presented no evidence of total number of male and female managers, overall percentage of males and females affected by employment action or that employer had discriminatory attitude toward women); Hagans v. Andrus, 651 F.2d 622, 627 (9th Cir.) (for purposes of establishing prima face case of disparate treatment on basis of sex, fact that low percentage of employees in high positions were women was meaningless without evidence of pool of qualified women applicants), cert. denied, 454 U.S. 859, 102 S.Ct. 313, 70 L.Ed.2d 157 (1981); Weaks v. North Carolina Dept. of Transportation, 761 F.Supp.2d 289, 308-309 (M.D.N.C. January 25, 2011) (anecdotal evidence that nine white employees were promoted while three African-American employees were not was not probative in absence of evidence regarding qualified labor pool). Accordingly, when a plaintiff has failed to present evidence regarding the employer's treatment of all relevant comparators, or at least a representative sample thereof, evidence that the employer has treated some employees more favorably than the plaintiff, standing alone, will be insufficient to establish that the employer displayed a pattern of treating the plaintiff and other members of the protected class worse than other similarly situated employees and, therefore, it will be insufficient to prove discriminatory intent.

The evidence in the present case showed that at least seventeen administrators were accused of abusing student during the relevant time period. See footnote 30 of this opinion. The plaintiff has not explained why not all of these administrators were similarly situated to her or why she was unable to use them as comparators, and we have no way of knowing whether the sample that she chose was representative. Because we have concluded, however, that the circumstantial evidence presented by the plaintiff in the present case did not show a pattern of discriminatory conduct, even if it is assumed that the plaintiff compared herself to all of the relevant comparators, and because the defendants have raised no claim in the present case that the plaintiff failed to identify all relevant comparators, we need not consider whether or how these principles would apply here.
[1] Under State v. Golding, 213 Conn. 233, 239, 567 A.2d 823 (1989), a defendant in a criminal case is entitled to appellate review of an unpreserved claim if the claim is of constitutional magnitude and the record is adequate for review of the claim. To prevail under Golding, the defendant also must demonstrate that his or her constitutional rights were violated and the state cannot prove that the violation was harmless beyond a reasonable doubt. Id., at 240, 567 A.2d 823. As the majority acknowledges, this court repeatedly has recognized that the Golding doctrine also applies in civil cases. Chatterjee v. Commissioner of Revenue Services, 277 Conn. 681, 694 n. 15, 894 A.2d 919 (2006); see, e.g., Bennett v. New Milford Hospital, Inc., 300 Conn. 1, 32, 12 A.3d 865 (2011); Perricone v. Perricone, 292 Conn. 187, 212 n. 24, 972 A.2d 666 (2009). Because I need not do so for purposes of the present case, however, I do not address the issue of whether the plaintiff's failure to bring her state constitutional claim under § 31-51q may be considered a waiver of the claim on the theory that competent counsel are presumed to have known of the claim but intentionally decided not to pursue it. Cf. State v. Kitchens, 299 Conn. 447, 482-83, 10 A.3d 942 (2011) (defendant deemed to have implicitly waived right to raise constitutional challenge to jury instructions when defense counsel fails to object to instructions after having been provided with copy of proposed jury instructions, allowed meaningful opportunity to review and comment on them, and counsel affirmatively accepts instructions proposed or given).
[2] As the majority notes, the plaintiff, in her brief to this court, did not seek Golding review of her state constitutional free speech claim under § 31-51q. It is apparent that she did not do so, however, because she viewed the claim as preserved. In any event, the majority's decision not to review her claim is predicated on what it characterizes as a problem more fundamental than her failure to seek Golding review, namely, her failure to raise a claim of constitutional magnitude. It is this latter conclusion with which I take issue.
[3] The first amendment to the United States constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."
[4] Article first, § 3, of the constitution of Connecticut provides: "The exercise and enjoyment of religious profession and worship, without discrimination, shall forever be free to all persons in the state; provided, that the right hereby declared and established, shall not be so construed as to excuse acts of licentiousness, or to justify practices inconsistent with the peace and safety of the state."
[5] Article first, § 4, of the constitution of Connecticut provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."
[6] Article first, § 14, of the constitution of Connecticut provides: "The citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance."
[7] I agree with the majority that the burden is on the appellee to demonstrate that the appellant will not be prejudiced by review of the appellee's unpreserved alternative ground for affirmance. I add, however, that the appellant first should be required to advance a colorable claim of prejudice so that the appellee will know the nature of the alleged prejudice that it must disprove.
[8] Practice Book § 63-4 provides in relevant part: "(a) At the time the appellant sends a copy of the endorsed appeal form and the docket sheet to the appellate clerk, the appellant shall also send the appellate clerk an original and one copy of the following:

"(1) A preliminary statement of the issues intended for presentation on appeal. If any appellee wishes to (A) present for review alternate grounds upon which the judgment may be affirmed ... that appellee shall file a preliminary statement of issues within twenty days from the filing of the appellant's preliminary statement of the issues...."
[9] The majority also states that, "even if we were to assume that a lack of prejudice to an appellant would justify review of an alternate ground for affirmance that was not raised in the trial court, even in the absence of other exceptional circumstances, the plaintiff in the present case has not established that the defendants would not be prejudiced if we were to review this claim." Text accompanying footnote 25 of the majority opinion. Thereafter, the majority explains that the defendants would be prejudiced by review of the defendants' alternative ground for affirmance. Because I believe that the better, more efficacious policy would be to permit review of unpreserved alternative grounds for affirmance whenever the appellant would not be prejudiced by such review, I would not "assume" that that is the appropriate policy approach for purposes of the present case only.
[10] The latter of these two considerations, namely, judicial economy, is especially important when the judgment would have to be reversed and a new trial ordered in the event that the reviewing court rejected an otherwise meritorious alternative ground for affirmance merely because it had not been raised in the trial court.
[11] I also note the general rule that, "[i]f the alternate issue was not ruled on by the trial court, the issue must be one that the trial court would have been forced to rule in favor of the appellee. Any other test would usurp the trial court's discretion." (Internal quotation marks omitted.) Zahringer v. Zahringer, 262 Conn. 360, 371, 815 A.2d 75 (2003), quoting W. Horton & S. Cormier, Rules of Appellate Procedure (2003) § 63-4(a)(1), author's comments, p. 138.
[12] In this regard, it bears noting that, in Peck, this court, without further explanation, "decided to address certain [of the] claims made by the [appellee] although he did not make them in the trial court"; Peck v. Jacquemin, supra, 196 Conn. at 61-62 n. 13, 491 A.2d 1043; and, in Bonner, we declined to review the appellee's unpreserved alternative ground for affirmance because the record was inadequate for review. See New Haven v. Bonner, supra, 272 Conn. at 497-500, 863 A.2d 680.
[13] To the limited extent that the denial of appellate review of unpreserved alternative grounds for affirmance may serve to deter parties from failing to raise claims in the trial court, I do not believe that that consideration trumps the significant interests favoring review of the claim.
[14] Indeed, in her complaint, the plaintiff expressly alleged that she had reported the abuse to the department "in the course of her employment-related obligations" and in the discharge of "her legal obligations as a mandated reporter pursuant to [s]tate ... statutory law." Moreover, there is nothing in the plaintiff's trial testimony to indicate that her reports of abuse were motivated by any other concerns or considerations, and the record is devoid of any other allegedly protected speech. Under the circumstances, therefore, it is difficult to see how the plaintiff's mandated reports to the department could be found to implicate the free speech rights that § 31-51q was intended to protect. Even if the defendants would not have been entitled to judgment as a matter of law on the plaintiff's unpreserved state constitutional claim, however, as I have explained, they were prejudiced by the plaintiff's failure to raise the claim in the trial court.