******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## ULYSES ALVAREZ *v.* CITY OF MIDDLETOWN
### (AC 41478)

Lavine, Elgo and Pellegrino, Js.

*Syllabus*

The plaintiff sought to recover damages from the defendant city for employ-
ment discrimination pursuant to the Connecticut Fair Employment Prac-
tices Act (§ 46a-51 et seq.) following his resignation from his employment
after he was notified by the defendant that he was going to be discharged.
The plaintiff, a Hispanic American citizen of Puerto Rican descent, who
was employed as a probationary police officer by the defendant and
was seeking a position as a police officer with the defendant's police
department, filed a two count complaint, alleging that the defendant,
in discharging him, had discriminated against him on the basis of national
origin and race. The defendant filed a motion for summary judgment
and submitted uncontroverted documentary proof to substantiate its
proffered legitimate, nondiscriminatory justification for deciding to dis-
charge the plaintiff, namely, the plaintiff's deficient performance
throughout his field training and probationary period. The trial court
granted the defendant's motion for summary judgment and rendered
judgment in favor of the defendant, from which the plaintiff appeal to
this court. *Held* that the trial court properly rendered summary judgment
in favor of the defendant, as the plaintiff failed to demonstrate the
existence of a genuine issue of material fact as to whether the defendant's
nondiscriminatory justification for his discharge was a pretext for unlaw-
ful discrimination on the basis of national origin and race: although the
plaintiff asserted that the defendant did not discipline other officers
who had performed deficiently in the same manner that he had been
disciplined, he did not produce any evidence to substantiate that asser-
tion, and the defendant presented contrary evidence that it had dis-
charged a Caucasian officer during his probationary period due to that
officer's failure to meet the police department's expectations and to
properly document reports in accordance with department require-
ments; moreover, the plaintiff's reliance on a certain question allegedly
asked by M, the defendant's chief of police, during the plaintiff's preem-
ployment interview as indicative of a discriminatory bias was unavailing,
as M's query contained no reference to the plaintiff's race or national
origin and could be asked of any potential employee, and because M,
following the interview, made the final recommendation to hire the
plaintiff and recommended that the defendant discharge the plaintiff
less than sixteen months later, the same actor inference was implicated,
which is based on the premise that if the person who discharges an
employee is the same person that hired him, one cannot logically impute
to that person an invidious intent to discriminate against the employee
and strongly suggests that invidious discrimination is unlikely when the
discharge occurred only a short time after the hiring; furthermore, the
plaintiff's assertion that an internal affairs report by G, a detective with
the defendant's police department, reflected a discriminatory bias that
influenced M's recommendation to discharge the plaintiff was also
unavailing, as the plaintiff furnished no evidence that M had received
G's internal affairs report prior to making his recommendation to the
defendant.

Argued April 11—officially released September 10, 2019

*Procedural History*

Action to recover damages for the defendant's alleged
employment discrimination, and for other relief,
brought to the Superior Court in the judicial district
of Waterbury, where the court, *Brazzel-Massaro, J.*,
granted the defendant's motion for summary judgment
and rendered judgment thereon, from which the plain-
tiff appealed to this court. *Affirmed.*

*James V. Sabatini*, for the appellant (plaintiff).

*Cindy M. Cieslak*, with whom were *Sarah L. Wilber* and, on the brief, *Michael J. Rose*, for the appellee (defendant).

*Opinion*

ELGO, J. In this employment discrimination action, the plaintiff, Ulyses Alvarez, appeals from the summary judgment rendered in favor of the defendant, the city of Middletown. The dispositive issue is whether the court properly determined that no genuine issue of material fact existed as to whether the defendant's non-discriminatory justification for the plaintiff's discharge was merely a pretext for unlawful discrimination. We affirm the judgment of the trial court.

In its memorandum of decision, the court set forth the following undisputed facts, as gleaned from the pleadings, affidavits and other proof submitted. "The plaintiff is a Hispanic American citizen of Puerto Rican descent residing in Waterbury, and was employed as a probationary police officer by the defendant. In October of 2013, the plaintiff applied to the defendant for a position as a police officer and went through the hiring process, which included a background check and an interview with the chief of police. The plaintiff alleges that [when] Detective Thomas Ganley was performing [his] background check, [Ganley] remarked that the plaintiff was 'too clean,' in reference to the plaintiff being a Puerto Rican from Waterbury. Nevertheless, the plaintiff's background check cleared and Ganley recommended the plaintiff move forward in the hiring process. . . . [T]he plaintiff [subsequently] was interviewed by Police Chief William McKenna. During the interview, the plaintiff claims that McKenna asked him if the plaintiff had any 'side bitches' or 'baby mama drama' he should know about. Even so, shortly thereafter the plaintiff received a conditional offer of employment on November 13, 2013, provided he undergo training at the Police Officer Standards and Training Council (POST).

"The plaintiff began attending POST on January 6, 2014. While there, the plaintiff was the only Hispanic cadet out of six recruits, and he alleges that he was subjected to racial slurs and derogatory language by some of his fellow trainees. . . . [T]he plaintiff graduated from POST on June 14, 2014, and he subsequently entered into the [defendant's] field training program. His supervising officer during this period made note of several performance deficiencies, including a lack of situational awareness, organizational issues, difficulty writing reports and [responding to] various calls, and the plaintiff initially failed his firearms training. His schedule was adjusted in response. On November 12, 2014, the plaintiff was cleared to conduct patrol work on his own.

"On February 4, 2015, a female resident, Jane Doe, came into the police headquarters and reported that the plaintiff groped her and made her feel his genitals through his pants while he was responding to a reported

domestic incident at her home. The plaintiff denied these allegations, but was placed on administrative leave on February 18, 2015, pending an internal affairs investigation. Detective Ganley was assigned to complete the investigation. During the course of his investigation, Officer [Elliot] Arroyo, a colleague of the plaintiff, made a statement to Ganley that, on the day on which the incident between the plaintiff and Jane Doe was alleged to have taken place, the plaintiff had met Arroyo for lunch and bragged to him that he had received oral sex from one of the individuals involved in the call he was on. The plaintiff denied making this statement but does not dispute that Arroyo reported such to Ganley.

"While the investigation was ongoing, McKenna ordered a performance evaluation on the plaintiff, which showed he still demonstrated notable performance deficiencies, including a failure to file written reports. In light of these deficiencies on March 4, 2015, McKenna sent a letter to the plaintiff informing him that he would be facing probationary discharge on March 6, 2015. The plaintiff subsequently resigned on that same date."[1] (Footnote omitted.)

The plaintiff filed a timely complaint with the Connecticut Commission on Human Rights and Opportunities, which issued a release of jurisdiction on October 30, 2015. The plaintiff then commenced the present action in the Superior Court. His complaint contained two counts, which alleged discrimination on the basis of national origin and race, respectively, in contravention of the Connecticut Fair Employment Practices Act (act), General Statutes § 46a-51 et seq. In its answer, the defendant admitted that the plaintiff was employed as a probationary police officer but denied the material allegations of the complaint, including the plaintiff's allegations that he "performed [his] job at or above a satisfactory level" and that "[a]ny and all excuses offered . . . to explain [his] termination would be a pretext to mask unlawful race [and] national origin discrimination" on the part of the defendant.

On August 18, 2017, the defendant filed a motion for summary judgment, which was accompanied by numerous exhibits. In response, the plaintiff filed an objection, to which he attached several exhibits. The court heard argument from the parties on January 8, 2018. In its subsequent memorandum of decision, the court articulated two distinct grounds for its decision to render summary judgment in favor of the defendant. First, the court concluded that no genuine issue of material fact existed as to whether the allegedly adverse employment action in question—the plaintiff's discharge—occurred under circumstances that give rise to an inference of discrimination. Second, the court concluded that no genuine issue of material fact existed as to whether the legitimate, nondiscriminatory justification articulated

by the defendant for the plaintiff's discharge was merely a pretext for unlawful discrimination.

On appeal, the plaintiff challenges the propriety of both determinations. We agree with the trial court that the plaintiff has not demonstrated the existence of a genuine issue of material fact as to whether the defendant's nondiscriminatory justification for his discharge was a pretext for unlawful discrimination. We therefore do not consider the propriety of the alternative ground for summary judgment articulated by the court.[2]

As a preliminary matter, we note the well established standard that governs our review of the trial court's decision to grant a motion for summary judgment. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . [T]he moving party . . . has the burden of showing the absence of any genuine issue as to all the material facts . . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. . . . Once the moving party has met its burden, however, the [nonmoving] party must present evidence that demonstrates the existence of some disputed factual issue. . . . Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary." (Citations omitted; internal quotation marks omitted.) *Lucenti* v. *Laviero*, 327 Conn. 764, 772–73, 176 A.3d 1 (2018). "The test is whether the party moving for summary judgment would be entitled to a directed verdict on the same facts." (Internal quotation marks omitted.) *SS-II, LLC* v. *Bridge Street Associates*, 293 Conn. 287, 294, 977 A.2d 189 (2009).

The present action involves an alleged violation of the act, which proscribes discriminatory employment practices on, inter alia, the basis of national origin and race. See General Statutes § 46a-60 (b). In his complaint, the plaintiff does not allege that he was discharged from his employment for both legitimate and illegitimate reasons. Rather, he claims that "[a]ny and all excuses offered by the defendant to explain the termination [are] a pretext to mask unlawful race [and] national origin discrimination . . . ." Accordingly, the analytical framework known as the "pretext/*McDonnell Douglas-Burdine* model"; *Levy* v. *Commission on Human Rights & Opportunities*, 236 Conn. 96, 105, 671 A.2d 349 (1996); applies in the present case. See *Martinez* v. *Premier Maintenance, Inc.*, 185 Conn. App. 425, 438, 197 A.3d 919 (2018).

As our Supreme Court has explained, under the pretext/*McDonnell Douglas-Burdine* model, "the employee must first make a prima facie case of discrimination. The employer may then rebut the prima facie case by stating a legitimate, nondiscriminatory justification for the employment decision in question. The employee then must demonstrate that the reason proffered by the employer is merely a pretext and that the decision actually was motivated by illegal discriminatory bias." *Craine* v. *Trinity College*, 259 Conn. 625, 637, 791 A.2d 518 (2002).

"Upon the defendant's articulation of . . . a non-discriminatory reason for the employment action, the presumption of discrimination arising with the establishment of the prima facie case drops from the picture." (Internal quotation marks omitted.) *Perez-Dickson* v. *Bridgeport*, 304 Conn. 483, 515, 43 A.3d 69 (2012). "[T]o defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination . . . ." (Internal quotation marks omitted.) *Taing* v. *CAMRAC, LLC*, 189 Conn. App. 23, 28, 206 A.3d 194 (2019), citing *Govori* v. *Goat Fifty, L.L.C.*, 519 Fed. Appx. 732, 734 (2d Cir. 2013); cf. *St. Mary's Honor Center* v. *Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) ("a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason" [emphasis in original]).

The legitimate, nondiscriminatory justification proffered by the defendant was the plaintiff's deficient performance throughout his field training and probationary period. In moving for summary judgment, the defendant submitted uncontroverted documentary proof to substantiate that justification.

Specifically, McKenna stated in his August 18, 2017 affidavit that the plaintiff exhibited "[s]everal performance deficiencies" during his field training. In an August 21, 2014 memorandum from Sergeant Michael Lukanik, the plaintiff's field training coordinator, to Captain Patrick Howard, Lukanik stated in relevant part: "I have been reviewing [the plaintiff's] daily observation reports along with frequently checking in with his field training officers since he has begun his field training with the Middletown Police Department [(department)]. [The plaintiff] has already begun to have some difficulties with basic situational awareness in non-stress conditions. It seems at this point that he is not progressing at the field training program pace." In a similar memorandum dated September 7, 2014, Lukanik noted that the plaintiff "still needs to work on some organizational issues." In his subsequent October 3, 2014 memorandum, Lukanik stated that although the

plaintiff was "due to start" the next phase of his field training, he "is not quite ready to [do so] at this time." Lukanik further indicated that he had met with the plaintiff and informed him "that at this point we needed to see a little more consistency. We spoke in detail that he needs to work on his organizational skills, and remembering the small details in terms of questioning persons on all types of calls and obtaining even the simple information such as telephone numbers. [The plaintiff] agreed and assured me that he would work hard to get better in those areas." As a result, the current phase of the plaintiff's field training was extended for an additional two weeks.

The plaintiff's performance issues during his field training also were documented in Lukanik's October 21, 2014 memorandum, in which he stated that although the plaintiff was "due to begin Phase IV (Shadow) in one week," the plaintiff "is still not ready at this point." Lukanik, along with Captain Howard and the plaintiff's field training officer, met with the plaintiff and informed him that "he has not shown that he is ready for Phase IV consistently. In speaking with his field training officers and reviewing his daily observation reports it is clear that there are some calls he handles on his own at [the] level of ability consistent with where he should be. There are other calls that he appears to almost revert back to early on in the training process, forgetting simple details and tasks that are crucial to our daily function as police officers. We discussed the inconsistencies at great length with [the plaintiff] in this meeting." At that meeting, Lukanik informed the plaintiff "that he would be extended for another block of time." Lukanik concluded his memorandum as follows: "At this point in [the plaintiff's] field training he has been exposed to several different field training officers on all three shifts. He has now been extended on field training a total of five weeks. I explained to him that we need him to really focus and buckle down at this point in his training. I explained to him that he needs to consistently be at a level capable of performing the duties of a police officer."

In an affidavit submitted in connection with the defendant's motion for summary judgment, McKenna averred that although the plaintiff completed his field training in November, 2014, his "deficiencies continued" following the commencement of his probationary period.[3] Those deficiencies are detailed in Lukanik's February 23, 2015 memorandum regarding the plaintiff's "ability to do the job functions of a police officer." In that memorandum, Lukanik noted that the plaintiff "initially failed his firearms qualification so the schedule needed to be adjusted several times throughout [his] training." Lukanik also noted that the field training program administered by the department normally entails "480-500 hours" of training. Nevertheless, the plaintiff ultimately required "a total of 624 hours of field train-

ing'' due to multiple extensions deemed necessary by his supervisors.

In his memorandum, Lukanik also explained that "[t]he one year probation upon completion of field training is to monitor [officers to ensure that they are] capable of performing all of the requirements of the job." Lukanik stated that he had reviewed "all of the calls for service that [the plaintiff] has been sent to as a primary responding officer" since his completion of field training and "found [fourteen] calls that [the plaintiff] did not write reports on that clearly should have been written on as per our department policy." Lukanik also detailed two cases "that easily could have been handled with very little investigative work" on the plaintiff's part, as well as an automobile accident in which the plaintiff submitted an unsatisfactory report to his supervisors.[4] Those three cases, Lukanik stated, were "simple cases that officers in this department are sent on routinely and should have easily been handled." Lukanik continued: "Given the [number] of hours [the plaintiff] received on field training and the amount of exposure to different types of calls while on training, he should easily be able to handle the calls that I have detailed above. The same deficiencies are still continuing that [the plaintiff] had while on field training. . . . [H]e does not consistently [handle calls in the proper manner] and he should be able to at this point. Forgetting basic information and choosing to not write reports that he clearly should creates a substantial risk of liability to the [department] and the [defendant]. Based on my training and experience as a field training officer, field training coordinator, and first line supervisor I do not believe that [the plaintiff] will progress past his current abilities. . . . [The plaintiff] has been exposed to many different types of calls and is still having issues with basic functions that police officers do every day."

McKenna articulated similar concerns in his March 3, 2015 letter to Mayor Dan Drew, which the plaintiff attached to his objection to the motion for summary judgment. In that correspondence, McKenna noted that "performance issues" were reported "on several occasions with regard to [the plaintiff's] performance, or lack of performance. During the course of a recent civilian complaint . . . it was revealed that he was unable, and/or unwilling, to handle basic functions of a police officer which shall be performed on a daily basis. We feel that [the plaintiff's] productivity has not met the department's expectations of a probationary employee and feel that he will not progress. The deficiencies have been documented and attempts were made to have him correct the issues, yet issues remained present." McKenna thus recommended that the plaintiff be discharged from his employment with the defendant.

As the trial court noted in its memorandum of deci-

sion, the plaintiff does not dispute that the aforementioned performance deficiencies existed. In his appellate brief, the plaintiff alleges that he was "not alone in his performance issues" and that the defendant "did not discipline other officers for the *same issues*." (Emphasis added.) He nonetheless has produced no evidence to substantiate that assertion. To the contrary, the defendant presented evidence that the defendant, on the recommendation of McKenna, had discharged a Caucasian officer during his probationary period due to that officer's failure to meet department expectations and failure to properly document reports in accordance with department requirements.

The plaintiff also points to a statement allegedly uttered by McKenna during his preemployment interview as indicative of a discriminatory bias. In his deposition testimony, the plaintiff alleged that McKenna "asked me if I had any side bitches or side girls or baby mama drama in Waterbury that he had to concern himself with because he didn't want that type of issues in the police department."[5] As the trial court noted, although tasteless, that query contains no reference to the plaintiff's race or national origin, and could be asked of any potential employee. In addition, the defendant presented uncontroverted evidence that, following that interview, McKenna "made the final recommendation" to hire the plaintiff. McKenna nonetheless recommended that the defendant discharge the plaintiff less than sixteen months later. In such circumstances, the same actor inference is implicated. "The premise underlying this inference is that if the person who fires an employee is the same person that hired him, one cannot logically impute to that person an invidious intent to discriminate against the employee." *Carlton* v. *Mystic Transportation, Inc.*, 202 F.3d 129, 132 (2d Cir. 2000). As the United States Court of Appeals for the Second Circuit has observed, the same actor inference "strongly suggest[s] that invidious discrimination was unlikely," particularly when "the firing has occurred only a short time after the hiring." *Grady* v. *Affiliated Central, Inc.*, 130 F.3d 553, 560 (2d Cir. 1997); see also *Lowe* v. *J.B. Hunt Transport, Inc.*, 963 F.2d 173, 175 (8th Cir. 1992) ("[i]t is simply incredible" that officials who hired plaintiff "suddenly developed an aversion" to his protected class "less than two years later"). In the present case, McKenna's recommendation came less than three months after the commencement of the plaintiff's probationary period, less than nine months after the commencement of his field training with the department, and less than sixteen months after the defendant first extended an offer of employment to him.

Also unavailing is the plaintiff's assertion that Ganley's internal affairs report reflected a discriminatory bias that influenced McKenna's recommendation to discharge the plaintiff.[6] The record before us is bereft of any evidence so indicating. Nothing in the affidavits,

deposition transcripts, and other documents submitted suggest that Ganley discussed his internal affairs investigation with McKenna prior to McKenna's March 3, 2015 recommendation. Furthermore, in his March 3, 2015 letter to Mayor Drew, McKenna detailed the performance issues that led him to recommend the plaintiff's discharge. Most significantly, McKenna at that time stated: "The *pending* internal affairs investigation may add additional reasons to support my reasons to recommend discharge." (Emphasis added.) For that reason, the trial court properly concluded that Ganley's internal affairs investigation "is ultimately irrelevant" because the plaintiff furnished no evidence that McKenna had received Ganley's report prior to making his recommendation to the defendant.

We have reviewed the pleadings, the defendant's motion for summary judgment, the plaintiff's objection thereto, and the exhibits submitted by the parties. On the record before us, no reasonable trier of fact could conclude that the defendant's nondiscriminatory justification for the plaintiff's discharge was merely a pretext for unlawful discrimination on the basis of race or national origin. As this court has observed, "to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination . . . ." (Internal quotation marks omitted.) *Taing* v. *CAMRAC, LLC*, supra, 189 Conn. App. 28. Because the plaintiff has not presented such evidence, we conclude that the court properly rendered summary judgment in favor of the defendant.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In his letter to the plaintiff, McKenna stated in relevant part: "This letter is notice that you will be facing probationary discharge from your position as Police Officer from [the defendant] due to various observations during the course of your [field training] and probationary period. There are reported violations of policies, procedures and the Middletown Police Department's Rules and Regulations."

On March 6, 2016, the plaintiff submitted his written resignation to the defendant, in which he stated: "I, Officer Ulyses R. Avarez, resign my position at the Middletown Police Department due to personal reasons." In his subsequent deposition testimony, which the plaintiff appended as an exhibit to his objection to the defendant's motion for summary judgment, the plaintiff stated: "I chose to write a letter of resignation because I was informed by Detective Puorro that he had confirmed with the chief that it was okay, that I could resign and retain my certification so I [could] find police work in other departments."

[2] Because "[s]ummary judgment is appropriate where no genuine issue of material fact exists, and the defendant is entitled to judgment as a matter of law, with respect to any one element that the plaintiff is required to prove in order to prevail at trial"; *Tyler* v. *Tyler*, 151 Conn. App. 98, 105, 93 A.3d 1179 (2014); accord *Perille* v. *Raybestos-Manhattan-Europe, Inc.*, 196 Conn. 529, 543, 494 A.2d 555 (1985) ("[a] defendant's motion for summary judgment is properly granted if it raises at least one legally sufficient defense that would bar the plaintiff's claim and involves no triable issue of fact"); an appellate court need not address every basis articulated by a trial court in rendering summary judgment. See, e.g., *James* v. *Valley-Shore Y.M.C.A, Inc.*,

125 Conn. App. 174, 176 n.1, 6 A.3d 1199 (2010) ("[i]n light of our conclusion that summary judgment was appropriate on that ground, we do not address the court's alternate basis for rendering summary judgment or the plaintiff's challenge thereto"), cert. denied, 300 Conn. 916, 13 A.3d 1103 (2011), citing *Valentine* v. *LaBow*, 95 Conn. App. 436, 448 n.11, 897 A.2d 624 ("[b]ecause we conclude that the court correctly determined that the defendant's fraudulent conveyance claim was barred by the three year statute of limitations contained in General Statutes § 52-577, we need not address the defendant's claims with respect to the court's alternate grounds for granting the motion for summary judgment"), cert. denied, 280 Conn. 933, 909 A.2d 963 (2006).

On our review of the record before us, we agree with the trial court that the plaintiff has not demonstrated the existence of a genuine issue of material fact as to whether the defendant's nondiscriminatory justification for his discharge was merely a pretext for unlawful discrimination. For that reason, we need not pass on the question of whether the plaintiff's discharge occurred under circumstances that give rise to an inference of discrimination. Even if we assume that such an inference is warranted in the present case, the plaintiff cannot prevail in light of our conclusion with respect to the nondiscriminatory justification proffered by the defendant.

[3] In his deposition testimony, McKenna explained that, after finishing POST training, new officers participate in the department's field training program, which consists of four phases. When an officer completes the field training program, the officer becomes a probationary police officer. The officer's probationary period lasts for one year from the date that field training was completed.

[4] As Lukanik stated, after the plaintiff submitted his written report on the automobile accident, "Sergeant D. Smith sent the report back several times to [the plaintiff] asking for him to do more work. [The plaintiff] sent it back with minor corrections that did not conclude the report to a satisfactory level. I requested [that Smith] send me the report so I could look at the issue. [The plaintiff] cleared the report stating that there were conflicting reports from both operators and he was unable to determine who caused the accident. He did not include anything in writing about where the vehicles were or any other investigative tools to help determine who caused the accident. He was told by [Smith] to add more information to support his findings and [the plaintiff] failed to be able to do so. Upon taking over the case, I received photographs that were taken of the accident by one of the persons involved. The photo is at the time of the accident and shows the position of both vehicles. It is clear in the picture that one vehicle cut a left turn too sharply into the oncoming traffic lane. It is also clear that the other vehicle clearly had both driver side tires over the double yellow line. [The plaintiff] should have clearly observed both violations and issued each operator the appropriate ticket, written warning, etc."

[5] The plaintiff does not allege that McKenna made any additional statements implicating either his national origin or his race subsequent to that preemployment interview.

[6] It is undisputed that, in 2013, Ganley recommended that the plaintiff move forward in the hiring process following the completion of a background check.